702 So.2d 988 (1997)
Kevin PUGH, et al., Plaintiffs-Appellants,
v.
Hayden MAYEAUX, et al., Defendants-Appellees.
No. 97-053.
Court of Appeal of Louisiana, Third Circuit.
October 29, 1997.
Rehearing Denied January 8, 1998.
Joseph A. Koury, Lafayette, for Kevin Pugh, et al.
John Craig Jones, Lafayette, for Hayden Mayeaux, et al.
Marc W. Judice, Lafayette, for Dr. Michael Foreman.
Before DOUCET, C.J., and THIBODEAUX and DECUIR, JJ.
DOUCET, Chief Judge.
In this medical malpractice action, plaintiffs, Kevin and Mavie Pugh, individually, and on behalf of their minor daughter, Tabitha Pugh, appeal a judgment of the trial court, rendered in response to an eleven to one jury verdict, dismissing their suit for damages. We affirm.

PROCEDURAL HISTORY
Plaintiffs' claims were first presented to a medical review panel which, on December 2, 1993, found, "The evidence does not support the conclusion that the defendants, Dr. Hayden Mayeaux [and] Dr. Michael Foreman, failed to meet the applicable standard of care as charged in the complaint." Thereafter, on December 15, 1993, the present suit was filed. The case was first tried to a jury September 13-21, 1995. That proceeding ended with the jury deadlocked and the trial judge declaring a mistrial. The case was retried to a second jury May 21-30, 1996. The present jury found in favor of defendants.

FACTS
This case turns on Mrs. Mavie Pugh's prenatal medical records generated by her treating physicians and those at Abbeville General Hospital, and the interpretation of those records by the various doctors who testified, *989 either at trial, by deposition, or both. Inasmuch as we affirm the judgment of the trial court, we will not examine any evidence or testimony related to Tabitha Pugh other than that which relates to whether the treatment rendered to her mother was below the standard of care and thus the cause of her medical problems.
Plaintiff, Mavie Pugh, first consulted the defendants, obstetricians/gynecologists (OBGYNS), Drs. Hayden Mayeaux and Michael Foreman, on September 24, 1991. At that time, Mrs. Pugh had missed several menstrual periods and suspected that she was pregnant. Dr. Mayeaux confirmed her suspicion and, from the date of the beginning of her last menstrual cycle, which she reported to be July 14, 1991, calculated her expected date of confinement to be April 21, 1992. During that visit her weight was recorded as 196¼ pounds and her blood pressure was found to be 126/80. A medical history was taken and a "high risk screening" form was completed. The form revealed no factors which would classify Mrs. Pugh's pregnancy as high risk. The only significant factor in her medical history was that she had had her gall bladder removed several years earlier.
In the course of her prenatal care, Mrs. Pugh was seen by either Dr. Foreman or Mayeaux (the two physicians care for each others patients interchangeably) a total of seventeen times. On each visit her record was reviewed by the physician seeing her, she was weighed and examined, her vital signs recorded, and a urine specimen taken and analyzed. On five of those visits Mrs. Pugh's systolic blood pressure equaled or exceeded 140. At no time did her diastolic blood pressure exceed 90. Her urine specimens were consistently negative for glucose and only once did a "trace" of albumin appear. Her total weight gain was approximately twenty-three pounds, well within guidelines, and during only one monthly period did her monthly weight gain exceed the recommended rate of not more than six pounds a month (between February 28 and March 31, 1992, she gained seven pounds). However, between March 31 and April 14, 1992, she lost one pound.
During the course of her pregnancy, it was determine that Mrs. Pugh was carrying a rather large baby and defendants ordered the appropriate tests to determine if Mrs. Pugh was physically capable of vaginally delivering the child. The test indicated that she was able to do so.
Mrs. Pugh last saw Dr. Mayeaux, in his office, on the morning of April 28, 1992. Dr. Mayeaux stated that at that time she complained of abdominal discomfort, occasional nausea and vomiting and back pain. He stated that all of these complaints were to be expected in a woman near her term of pregnancy. Dr. Mayeaux testified that Mrs. Pugh was only "finger-tip" dilated and that she was having occasional contractions. He sent her to the hospital for a pelvocephalogram to verify that she was still vaginally able to deliver her child and told her to return home afterwards, but to call if she had any problems. Mrs. Pugh called the office about noon to report that she was not improving, so Dr. Mayeaux told her to report to the hospital. Mrs. Pugh testified that she informed both Dr. Mayeaux and the admitting nurse at the hospital that she had not been able to keep anything on her stomach for the preceding two weeks and that she had severe abdominal pain. Neither the doctor's records nor the hospital records support her testimony. Dr. Mayeaux testified that when Mrs. Pugh was admitted to the hospital he was informed that no fetal monitor was available, as all were in use. He, therefore, ordered the nurse to manually monitor Mrs. Pugh's contractions. Nurse Nunez's testimony and the hospital records support his testimony. Upon admission to Abbeville General at 12:20 P.M., Dr. Mayeaux's diagnosis was that Mrs. Pugh was at term in her pregnancy, possibly in early labor and that she possibly had gastroenteritis. Mrs. Pugh's blood pressure and other vital signs were within normal limits and her urine was negative for both glucose and albumin. Hospital records show she complained of past occasional headaches and blurred vision, but stated that these symptoms were not current. Mrs. Pugh refutes the record claiming she complained of current symptoms. Nurse Nunez's assessment of Mrs. Pugh, which she reported to Dr. Mayeaux, was that Mrs. *990 Pugh was neither in pain nor dehydrated and that she appeared to be in normal condition for a lady nine months pregnant. Because Mrs. Pugh had reported some vomiting earlier in the day, Dr. Mayeaux ordered an I.V. of five percent dextrose in lactated ringers (D5-R/L) started. The hospital records indicate that the laboratory test determined Mrs. Pugh to have normal blood sugar, hemoglobin, blood urea nitrogen (BUN) and creatinine levels. It was established that had she been dehydrated, one would have expected to see an elevated BUN level.
Dr. Foreman took over Mrs. Pugh's care at approximately 4:45 P.M., April 28, 1992. At that time, he called the hospital for her status report. As Mrs. Pugh still had complaints of mild nausea and vomiting, Dr. Foreman ordered Phenergan®, an antinauseant. By this time, a fetal heart monitor had become available and had been attached to Mrs. Pugh. It showed the baby to have a fetal heart rate well within normal limits. Nursing records from the hospital show that between 3:00 P.M. and 11:15 P.M. Mrs Pugh was assessed ten times by the nurse on duty. Her condition was basically unchanged until 11:15 P.M., when Nurse Hollier noted that her temperature had risen to 99.3 degrees and that Mrs. Pugh's abdomen appeared distended. At that time, Mrs. Pugh complained of pain over the entire abdomen and was vomiting a "dark green liquid."
Nurse Hollier immediately notified Dr. Foreman who, for the first time suspected pancreatitis, ordered a "STAT" (immediate) amylase level, the insertion of a nasogastric (NG) tube and suction to empty the stomach and help relieve her nausea, an increase in the rate of Mrs. Pugh's I.V. fluids and a consult with Dr. Weston Miller, a general surgeon. Dr. Foreman immediately came to the hospital where he consulted with Dr. Miller. The two physicians waited to get the results of the serum amylase test before talking to the patient and her family. The amylase level came back as 225 (normal is between 12 and 87). From that result and the pain Mrs. Pugh was experiencing, Dr. Miller concluded that if Mrs. Pugh had pancreatitis, it was mild. He explained that to be absolutely sure she had acute pancreatitis he would have expected to see an amylase level around 500 and that is was not uncommon to see levels in the 1000 range. The physicians explained their conclusions to the family and Dr. Miller examined Mrs. Pugh. Mr. Pugh wanted the doctors to do an immediate cesarean section, but Dr. Miller explained that acute pancreatitis, although quite painful, was usually a self limiting disease which cleared up spontaneously in three or four days, and that surgical intervention produced a mortality rate of fifty to seventy-five percent. Dr. Miller convinced the family the conservative treatment was the best course and as the fetal heart monitor showed the baby not to be in distress, Dr. Foreman agreed with Dr. Miller. Dr. Miller noting that Dr. Foreman had already increased Mrs. Pugh's I.V. fluid and had ordered a NG tube with suction, merely added an order for Mepergan®, for pain, insertion of a foley catheter to monitor urine output and a sonogram of the liver and pancreas to get a better idea of the patient's condition.
The records show that Mrs. Pugh's condition remained basically unchanged until approximately 3:45 A.M. when the nursing notes reflect she began thrashing about because of her continued abdominal pain. Both Drs. Foreman and Miller were notified and Dr. Miller discontinued the Mepergan® and ordered twelve milligrams of morphine to try and relieve Mrs. Pugh's pain and a bolus or single large dose of I.V. fluid. When Mrs. Pugh had not improved by 4:45 A.M., Nurse Colvin, once again, contacted her physicians. Dr. Miller ordered Mrs. Pugh transferred to the intensive care unit (ICU).
Upon her transfer to ICU, it was noted that her I.V. was running at 200 cc/hour, she was still complaining of abdominal pain, but was no longer vomiting. The fetal heart monitor still showed the baby's heart rate to be within normal limits. The nursing progress notes for 7:00 A.M., April 29, 1992, indicate that both the mother's and the baby's condition appeared to be unchanged. At 7:30 A.M., Dr. Miller called in, ordered several laboratory tests, an ultrasound and a sonogram and changed Mrs. Pugh's pain medication from morphine to Dilaudid®. He also ordered another bolus of I.V. fluid.
*991 Between 7:30 and 8:30 A.M., when Dr. Miller arrived to examine Mrs. Pugh and review the results of the tests previously ordered, Sandy Hogan, a nurse from the OB department was called in to examine Mrs. Pugh and reposition the fetal heart monitor. Her examination revealed either very mild uterine contractions or possible uterine irritability. The repositioned fetal heart monitor showed a fetal heart rate of 150 to 170 beats per minute, within normal limits. After examining the patient and her tests results, Dr. Miller was convinced that Mrs. Pugh had "turned the corner" in her bout with pancreatitis and decided to treat her more aggressively, with additional I.V. fluids. He communicated this to Drs. Foreman and Mayeaux.
At 10:00 A.M., Dr. Mayeaux examined Mrs. Pugh. He noted no signs of contractions, observed that the fetal heart monitor showed the baby's heart rate to be 145 to 160 beats per minute, which is within normal limits, and ordered that Mrs. Pugh be repositioned to her left side to relieve any possible uterine pressure on her vena cava. Mrs. Pugh continued to receive copious amounts of I.V. fluids and when she was checked by the nurse at 11:00 A.M. was observed to be sleeping soundly, still on her left side. At that time, the fetal heart monitor showed the baby's heart rate to be 135 to 150 beats per minute, a decrease which warranted close observation. When checked fifteen minutes later, the baby's heart rate had further decelerated to between 110 and 125 beats per minute. At that point, Nurse Touchet paged all three doctors involved in Mrs. Pugh's care. Dr. Foreman arrived within seven minutes and noted that the baby's heart rate had continued to drop to 100 to 130 beats per minute, indicating fetal distress. He immediately notified the operating room (OR) to prepare for an emergency cesarean section and obtained consent from Mr. Pugh for the procedure. Mrs. Pugh was transferred to the OR at approximately 11:30 A.M. and Tabitha was delivered at 11:42 A.M. Upon delivery Tabitha had no vital signs and had to be resuscitated by Dr. Powlen Manuel, who was called in as the baby's pediatrician.
Immediately following the delivery of Tabitha by Dr. Foreman, Dr. Miller extended Mrs. Pugh's incision to reveal an edematous, hemorrhagic and gangrenous pancreas. Mrs. Pugh's condition necessitated the performance of a pancreatectomy, duodenectomy, hemigastrectomy and splenectomy. While Dr. Miller performed these procedures, Dr. Foreman applied continuous pressure to Mrs. Pugh's uterus, which would not stop hemorrhaging. This required Dr. Foreman to leave the operating suite to get permission from Mr. Pugh to perform an emergency hysterectomy on his wife.

LAW AND DISCUSSION
As we see it, although plaintiffs argue one theory of liability, i.e., medical malpractice, they argue two different "acts" or "periods" of malpractice: the pre-natal treatment of Mrs. Pugh from her first visit to defendants' office in September 1991 through her last visit there on the morning of April 28,1992; and her treatment in Abbeville General Hospital beginning at approximately 12:20 P.M. April 28, 1992, and concluding when she was rushed into surgery for an emergency cesarean section (and other subsequent surgical procedures) at approximately 11:30 A.M. April 29, 1992.
The case presented to the jury consisted of the pre-natal records of Mrs. Pugh from defendants' office, hospital records, the testimony of plaintiffs Kevin and Mavie Pugh and of a number of doctors called by plaintiffs as experts in various field of medicine. Some of the doctors testified "live" while the testimony of others were presented by written or video depositions. Both defendants testified and they also presented other physicians, as expert witnesses in their behalf. For the sake of brevity, when all the experts of one side testified about and agreed on a particular point, we will simply refer to the "plaintiffs" or the "plaintiffs' experts" and to the "defendants" or the "defendants' experts."
Plaintiffs' theory of the case is that Drs. Foreman and Mayeaux breached the standard of care by not considering Mrs. Pugh's pregnancy high risk, in not testing her for gestational diabetes, in not diagnosing her with gestational hypertension and pre-eclampsia, *992 and in a late diagnosis of pancreatitis.
Dr. Leslie Iffy, whose deposition was introduced by the plaintiffs, and who testified therein as an expert OB-GYN, stated that Mrs. Pugh's weight, alone, should have been enough to classify her pregnancy as high risk because of an increased incidence of gestational diabetes in obese women. Dr. Iffy opined that a glucose tolerance test for diabetes should have been administered to Mrs. Pugh between her twenty-fourth and twenty-eighth week of pregnancy. He stated that the failure of the defendants to do so constituted a breach of the standard of care. Both Drs. Foreman and Mayeaux disagreed with this conclusion as did Drs. Jeffrey Phelan and James Zehnder, who were called as experts by the defense. The defendants and the witnesses for the defense agreed that for a woman's pregnancy to be considered high risk because of her weight that she would have to be classified as clinically "obese." They cited Cunningham, et al., Williams Obstetrics, 18th Edition, Norwalk, Ct. (1989), Appleton & Lange, as authority and which defines clinically "obese" as weighing at least 250 pounds. Mrs. Pugh's weight never exceeded 212 pounds during her pregnancy. Defendants also pointed out that urine specimens were taken on each prenatal visit and tested negative for glucose on each occasion.
Dr. Iffy was of the opinion that Mrs. Pugh developed gestational diabetes (he claimed the size of the baby confirmed this) and that the five elevated systolic readings supported his conclusion that Mrs. Pugh also developed gestational hypertension and that this led to pre-eclampsia which in turn called for Mrs. Pugh's pregnancy to be terminated as soon as possible. He opined that the pregnancy should have been terminated one to three weeks before Tabitha was delivered. It is uncontested that at the time Mrs. Pugh's cesarean section was ordered, that Tabitha was in fetal distress and that Mrs. Pugh was suffering from acute edematous pancreatitis. It is also undisputed that the mother's pancreatitis was, at least, a major factor in the injuries suffered by Tabitha.
Defendants maintained that Mrs. Pugh never contracted gestational diabetes, gestational hypertension, or pre-eclampsia and that their diagnosis of her acute pancreatitis was timely. They explained that the usual reason for the large size of a baby is the size of the mother, and more her weight than her height. They noted that Mrs. Pugh weighed 196¼ pounds on her initial visit and thus they would expect a rather large baby. The defense pointed out that gestational hypertension is defined in Williams Obstetrics, supra, as consistent blood pressures over 140/90. They noted that while Mrs. Pugh's systolic pressure exceeded 140 on five of her seventeen visits, it was never consistently over the 140 mark. Additionally, they pointed out that her diastolic reading (the more significant of the two) never exceeded 90. Defendants experts unequivocally agreed that Mrs. Pugh had developed neither gestational diabetes nor gestational hypertension. They were also unequivocal in their opinion that Mrs. Pugh did not have pre-eclampsia. They noted that the two hallmarks of pre-eclampsia are hypertension and albumin in the urine and that Mrs. Pugh exhibited neither of these symptoms.
As to the timely diagnosis of Mrs. Pugh's pancreatitis, defendants pointed out that the two most common causes of pancreatitis are gall stones and alcoholism. Mrs. Pugh had no gall bladder and did not use alcoholic beverages. Dr. Miller, who was the physician who treated Mrs. Pugh for her pancreatitis, stated that he considered his consult to be timely. Dr. Jeffrey Phelan, one of defendant's experts, testified because of Mrs. Pugh's medical history, Drs. Foreman and Mayeaux had very little reason to suspect pancreatitis before 11:15 P.M., April 28, 1992. Further, Dr. Phelan stated that "... Mrs. Pugh had one (1) of the rarest forms of pancreatitis which was not amenable to any form of therapy. And regardless of what anybody did, she was going to go the way she went ..."
Dr. Steven Donn, a neonatologist who testified on behalf of plaintiffs, opined that Tabitha sustained the injury to her brain one and one-half to seven and one-half hours before her birth. Dr. Jay Goldsmith, the chairman of the Department of Pediatrics and Neonatology at Alton Ochsner Medical Foundation *993 in New Orleans, who testified for defendants, stated that, in his opinion, Tabitha sustained most of her brain damage in the last twenty to thirty minutes before she was born. However, he also noted that after Tabitha was transferred from Abbeville General to Women's and Children's Hospital in Lafayette, her blood pH fell below seven "a number of times" indicating difficulties at those times. Dr. Phelan agreed with Dr. Goldsmith and stated that he would "strongly disagree" with anyone who opined that Tabitha's brain damage occurred hours before her birth.
Defendants opined that Tabitha's injuries occurred from placenta abruption, a premature separation of the placenta from the uterus, a condition of unknown etiology which is rare and unforeseeable. Dr. Goldsmith also pointed out that pathology reports revealed that Tabitha was connected to her mother by only one umbilical artery rather than the normal two arteries, thus compounding Tabitha's problems.
On appeal the plaintiffs raise only two issues, although they list four assignments of error. Those issues are that the jury was clearly wrong in finding the defendants did not breach the standard of care Mrs. Pugh should have expected and that the trial judge erred in not allowing counsel for plaintiffs to use two medical texts, published two years after plaintiffs ordeal, in his cross examination of defendants and their experts.
In reviewing this case we are guided by the principles enunciated by the Louisiana Supreme Court in Ferrell v. Fireman's Fund Ins. Co., 94-1252, pp. 4,5 (La.2/20/95); 650 So.2d 742, 745-746 wherein the court stated:
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), we synthesized the "manifest error" and "clearly wrong" appellate review of facts limitations that have been handed down by this court in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) and Canter v. Koehring, 283 So.2d 716 (La. 1973) and the United States Supreme Court in Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), and United States v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948), as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. * * * The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the findings in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. * * * In applying the manifestly erroneous clearly wrong standard to the findings below, appellate courts must constantly have in mind that their review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But *994 where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Id. at 844-45 (citations omitted).
Our opinion in Stobart v. State, 617 So.2d 880 (La.1993), was not intended to change that synthesis or to make the scope of appellate review of facts any more limited than described in Rosell, Arceneaux, Canter, et al., supra.
In the case sub judice, it is clear that the jury's decision was not clearly wrong. The jury's decision was based upon its evaluation of the conflicting testimony presented and their evaluation of the evidence introduced by the respective parties. There is no indication that its evaluation of the testimony and evidence was unreasonable or manifestly erroneous.
As to the trial judge's decision to exclude the introduction or the use of the texts at issue, our brethren of the second circuit recently stated:
Generally, parties should be given the opportunity to cross-examine witnesses on any relevant matter. Thibaut v. Thibaut, 607 So.2d 587, 600 (La.App. 1st Cir.1992), writs denied, 612 So.2d 37, 38, & 101 (La. 1993). The determination of the relevancy of tendered evidence and, therefore, the scope of cross-examination is within the discretion of the trial judge, whose rulings will not be disturbed in the absence of abuse of discretion. State v. Lard, 568 So.2d 629, 632 (La.App. 2nd Cir.1990).
Osborne v. Ladner, 96-863 p. 5 (La.App. 1 Cir. 2/14/97); 691 So.2d 1245, 1251. In the case at bar, counsel for plaintiffs planned to use two texts published two years after the incidents which led to this suit to, at least, cross examine and discredit the testimony of the defense. Its is unclear if plaintiff intended to offer the texts into evidence as the proceedings never reached that issue. The defense objected to plaintiffs use of the books and the trial judge sustained the objection noting that since the books were published subsequent to the facts at issue they were not relevant and that their use could confuse the jury. We find this ruling well within the discretion of the trial judge.
On appeal, plaintiffs attempted to once again use the excluded texts to discredit defendants' case and to influence this court in their favor. Both defendants have filed separate motions to strike seeking to exclude photostatic copies of portions of the excluded texts included in plaintiffs' brief and to strike references to the excluded material in the body of plaintiffs' brief. We find defendants' motions well founded and will not consider either the photostated material or those portions of plaintiffs' brief or reply brief which makes reference to same.
Accordingly, for the reasons stated above, the judgment of the trial court is affirmed. All costs of this appeal are assessed against plaintiffs Kevin and Mavie Pugh.
AFFIRMED.