JjDOUCET, Chief Judge.
Defendant, Johnny Evans, Jr., was charged by a bill of information with second degree murder, a violation of La.R.S. 14:30.1. On June 15-18, 1998, the Defendant was tried before a twelve-person jury, which found him guilty as charged. Thereafter, the court sentenced the Defendant to serve life at hard labor without benefit of parole, probation or suspension of sentence. Defendant now appeals on the basis of five assignments of error.
Defendant was sentenced on August 21, 1998. Thereafter, on October 28, 1998, he filed a Motion for New Trial. That motion was denied after a hearing held February 4,1999.
J^FACTS
On August 25, 1997, the Defendant and Eric Pickens beat Ernest Prater with a baseball bat. Before leaving the scene, the Defendant handed Pickens a gun and told him to finish Prater off. Steps were taken by the Defendant to destroy the evidence that linked the two men to the scene of the murder. A few days later, the Defendant presented himself to the police with the story that he was being threatened by some men from Texas and that it was his belief that these men may have killed Ernest Prater.
ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. That review reveals one error patent.
The Defendant was not informed of the three-year time limit for filing post-conviction relief as is required by La.Code Crim.P. art. 930.8. Thus, the district court is directed to inform the Defendant of the provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993).
ASSIGNMENT OF ERROR NOS. 3 & 4
Due to the similarity of these two assignments, they will be considered together. By assignment of error number three, the Defendant contends that he should have been granted a new trial. The Defendant states that the basis for his argument is La.Code Crim.P. art. 851(1) and (5), which reads in pertinent part:
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
_li • ■ •
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
By assignment of error number four, the Defendant argues that the evidence adduced by the State was insufficient to support the verdict.
To prove second degree murder, the state must establish beyond a reasonable doubt that the defendant specifically intended to kill a human being. La.R.S. 14:30.1. The Defendant argues that there is no evidence to show that he had the specific intent to kill Ernest Prater.
Specific criminal intent is a state of mind, and, as such, need not be proven *869 as fact but may be inferred from the circumstances and the actions of the accused. State v. Meyers, 95-750, 96-35, 96-395 (La.App. 5 Cir. 11/26/96); 683 So.2d 1378; State v. Nguyen, 95-1055 (La.App. 5 Cir. 3/26/96); 672 So.2d 988, writs denied, 96-1019 (La.10/4/96); 679 So.2d 1377; 96-2087 (La.10/7/96); 680 So.2d 639. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the Jackson standard. State v. Huizar, 414 So.2d 741 (La.1982); State v. Meyers, 683 So.2d 1378; State v. Hill 93-405 (La.App. 5 Cir. 3/29/94); 636 So.2d 999, writ denied, 94-3144 (La.9/1/95); 658 So.2d 1259.
In the instant case, that intent could be inferred from the testimony of Eric Pickens, who testified that the Defendant knocked Ernest Prater out with a baseball bat and then continued to beat him in the head a number of times with the bat.
The record shows that on August 14, 1997, Johnny Evans, Sr. (the father of the Defendant) arrested Ernest Prater in connection with a drive-by shooting incident. Once Prater was at the police station, he requested to speak to Betty Pichón with the Lnarcotics division, informing Officer Evans that he was told he could call on her at any time. Once the narcotics officers arrived, Prater told them that he could give them the name of someone that was selling drugs. Based on this information, Officer Evans and the other officers proceeded to the home of Eric Pickens and arrested him. Officer Evans testified that Pickens was a friend of his son, the Defendant, and that Pickens had lived with them for a short while. Officer Evans testified that his son had posted bond for Pickens on August 14,1997.
Pickens testified that after this incident, he went over to the Evans’ residence and during his visit, Officer Evans told Pickens and his son, the Defendant, that Ernest Prater had turned Pickens in on the drug charges and that was why Prater was out of jail. Officer Evans, on the other hand, testified that although Pickens came to his house, he never told the boys about Prater’s involvement in Pickens’ arrest.
Pickens testified that on the afternoon of August 25,1997, he and Quincy Jones went with the Defendant, to the pawn shop and the Defendant purchased an SKS rifle. Pickens testified that later that night the Defendant called him and said they were going to a party. When the Defendant stopped to pick up Pickens, Ernest Prater was sitting in the front passenger seat. The trio left the party after a few minutes and went to Fort Polk, stopping at the Subway on Entrance Road to meet Brad McManus. Pickens testified that the Defendant got out of the car and talked to McManus. McManus testified that he was simply meeting with the Defendant to pay him for a CD player. Pickens, however, testified that upon returning to the vehicle, the Defendant stated that they were to meet McManus at Vernon Lake “ ‘cause he got a jack” (“buying” dope but keeping the money). Pickens testified that when they got to the lake, the Defendant drove all around the lake flashing his lights before finally stopping the car. They all 1 Rexited the car. Pickens and Prater began smoking while the Defendant began beating a tree with a bat that Pickens testified Prater had brought with him.
As support for the fact that Prater was carrying a bat that night, Officer Wilson testified that Prater had called him on August 25, 1997, and requested that Wilson meet him. When Wilson arrived at the meeting, he noticed that Prater was carrying a wooden bat. Prater told Officer Wilson that he was supposed to meet the Defendant that night. Prater was to page Officer Wilson around 9:00 p.m. that night. Officer Wilson- testified that he never heard from Prater after their meeting.
Pickens testified that Prater stated that he needed to use the bathroom and that as he passed the Defendant, the Defendant *870 hit him as hard as he could in the head with the bat. Pickens testified that with the first blow Prater fell face first onto the ground. He stated that after the Defendant hit Prater several more times with the bat, that the Defendant handed the bat to him and he hit Prater a- number of times. Pickens stated that he then handed the bat back to the Defendant and the Defendant started hitting Prater again until he said “damn, the bat broke.” Pickens testified that the Defendant then got a handgun (not the SKS that the Defendant had purchased earlier in the day) out of his car and told him to finish Prater off. Pick-ens stated that he shot Prater, gave the gun back to the Defendant, and they got in the Defendant’s car and left. Pickens further stated that they pulled up near the dam on the spillway and tossed the bat into the water. The two then went to Marion Bonner Lake where, Pickens testified, the Defendant threw “something” into the dumpster. The two then walked down to the lake where the Defendant threw the bullets and the gun into the lake. Pickens testified that after leaving the lake they washed the car at the car wash in Sandy Hill, and then the Defendant dropped him off at home.
| ^Pickens testified that two days later the Defendant came to his house with different tires on his car explaining that on a trip to Lafayette he had thrown his old tires into the river. Pickens also testified that, on August 29, 1997, the Defendant asked him to go with him to the DeRidder Police so that he could tell them that “some dudes from Texas” were looking for him, that he was scared, and that he thought they had killed Prater.
Detective Larry Smith of the Vernon Parish Sheriffs Office testified that at approximately 7:30 p.m. on the evening of August 29, 1997, he received a phone call from Detective Betty Pichón of the Beauregard Parish Sheriffs Department narcotics division, requesting a meeting in reference to the investigation of Earnest Prater’s death. At approximately 9:30
p.m. Detective Pichón and another narcotics officer, Detective Saul Wilson, arrived accompanied by the Defendant. Detective Smith testified that he and another Detective, Ronnie Hagen, took a statement from the Defendant consistent with the story he had told Eric Pickens he wanted to tell the police. When the two Detectives began to question the Defendant about when he had last seen Prater or if he had any knowledge of what happened to Prater that the Defendant became more and more agitated and left the Vernon Parish’s Sheriffs Office. The Defendant was later arrested for the murder of Ernest Prater.
Mose Tinsley testified that he met the Defendant in the bull pen at the Vernon Parish jail. Tinsley testified that he and Jessie Johnson were in their cell block discussing snitches when the Defendant walked by and joined their conversation. Tinsley testified that the Defendant stated that a snitch needed to be handled. Tins-ley further testified:
A. He said, “like that son-of-a-bitch at the” — I said, “well, what are you talking about?” He said, “like that son-of-a-bitch at the lake.” And I asked him, “what you mean?” He said “that son-of-a-bitch |7that — you know, that was found out there at the lake.” I said, “well, how — what happened to him?” He said, “I busted the bastard in the head with a bat and then I shot him.”
Q. What else?
A. And so we was sitting there talking and I asked him again — I ask him, I said, “well, how did you know he was a snitch?” I said, “what makes you think he was a snitch?” And he said, “because my old man works for the police force and he said if we didn’t do something about it, he was going to get us busted.”
Q. Describe how he was acting during this time.
A. Well, the more we talked — the more we talked about it, he just went into a rage. You know, he’d get mad— *871 get — he was just — you know how somebody just work thereself [sic] up into a frenzy. (EXACTLY AS STATED)
Q. And is that what happened?
A. Yes sir and you know, he got to talking about all ...
Q. Did he tell you what happened to the man at the lake?
A. No, he just said when he — as the conversation went on, he’s talking about how he hit him with the bat and then he shot him and fire was coming out the barrel that long. (EXACTLY AS STATED)
(DEMONSTRATED)
Q. What else did he tell you about it?
A. He said that — so Jessie asked him, “well, what did the other guy do?” And he said, “he didn’t do a damn thing” — he said, “because I made his ass get back in the car, he’s weak.” And then he said they got back in the car and he put him in the car and they drove around the area to make sure that wasn’t nobody — you know, at — the way the lake is made, it’s a circle out there, I guess, and he drove around it to make sure that nobody was out there and he left. And then he got on the part about how the detectives up here was doing him, taking his tennis shoes and took his brother’s tennis shoes but the tennis shoes they looking for — they wouldn’t never find them. (EXACTLY AS STATED)
Q. Is that what this defendant told you?
A. That’s what he said.
|rQ. What did he tell you happened to them?
A. He never said.
Q. Just said they’d never find them?
A. Yeah.
Q. Did he say anything about the tires?
A. He said he had changed it — he took the tires off but he said he took and changed the tires and then he also said he had sold' — -he’s telling us now, he told us he sold the car to somebody in New Orleans. I don’t know how but that’s what he said. (EXACTLY AS STATED)
In his brief, the Defendant states that there is no evidence to show that he had the specific intent to kill or inflict great bodily harm upon Ernest Prater. However, we find, based on the testimony of Pickens combined with the testimony of Tinsley, that it was reasonable for the jury to conclude that the Defendant indeed had the specific intent to kill Ernest Prater.
The trier of fact is to determine the requisite intent in a criminal case. State v. Butter [Butler], 322 So.2d 189 (La.,1975). In reviewing the correctness of such a decision, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince the reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt of every element of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, (1979).
State v. Huizar, 414 So.2d at 751. Additionally, great deference should be afforded a jury’s credibility determinations. Pugh v. Mayeaux, 97-053 (La.App. 3 Cir. 10/29/97); 702 So.2d 988. Accordingly, we find Defendant’s argument that there is insufficient evidence to show that he had specific intent in order to support his conviction for second degree murder is without merit.
I ¡ASSIGNMENT OF ERROR NO. 1
By assignment of error number one, the Defendant contends that the trial court erred when'it denied his motion for mistrial after the District Attorney made reference to the polygraph examination taken by the State’s key witness, Eric Pickens.
*872 During the prosecutor’s opening statement, he said:
Eric Pickens has entered into an agreement, that agreement with the State of Louisiana that he takes a polygraph, then pleads guilty to the offense of manslaughter, agrees to testify truthfully and after he testifies, take another polygraph.
The prosecutor contends that the reason he told the jury about the polygraph test was to set forth the elements of the plea agreement Eric Pickens had made, and that he did not mention the results of the test or even that the test had been taken.
Evidence of a polygraph examination or any reference thereto during trial is inadmissible in Louisiana. State v. Catanese, 368 So.2d 975 (La.1979); State v. Hocum, 456 So.2d 602 (La.1984). Polygraph evidence for any purpose is to be excluded from a criminal trial to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony. State v. Tonubbee, 420 So.2d 126 (La.1982); State v. Davis, 407 So.2d 702 (La.1981). Such a reference invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully. Id.; see also, State v. Refuge, 270 So.2d 842 (La.1972).
In State v. Hocum, 456 So.2d 602 (La.1984), the court considered a similar issue. The Hocum court stated that:
By informing the jury that the witness had testified under protection of a grant of immunity, that the grant of immunity was conditioned upon his taking and passing a polygraph examination, and that the grant of immunity did not apply to perjury or any crime other than the Hocum abduction, the state, in effect, informed the jury that the witness had passed an examination with regard to the Hocum case and would testify |inat trial consistently with his examination or expose himself to a perjury prosecution. Thus, the state’s conduct and the trial judge’s ruling were clear violations of this court’s decisions prohibiting the use of polygraph evidence in criminal trials.
The trial court fell into error because it assumed that the state had a duty to place the entire immunity agreement before the jury. It is true that suppression of material evidence constitutes a violation of due process justifying a new trial irrespective of the good faith or bad faith of the prosecution; Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and, that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Evidence is not admissible, however, simply because it is contained in an immunity or plea agreement which must be disclosed to the court and the defendant. References to irrelevant, prejudicial and otherwise inadmissible matters are often excised. See, e.g., United States v. Roberts, 618 F.2d 530 (9th Cir.1980); United States v. Arroyo-Angulo, 580 F.2d 1137 (2nd Cir.1978). Consequently, the state was obliged to disclose the terms of its immunity for testimony agreement with its witness, but that duty did not make evidence of a polygraph examination admissible or give the state the right to introduce it over defendant’s timely objection.
We do not, however, automatically reverse a conviction whenever an impermissible reference is made to the occurrence of a polygraph examination during a criminal trial. A reversal and a new trial is required only if there is a reasonable possibility that the error complained of might have contributed to the conviction. State v. Gibson, 391 So.2d 421 (La.1980).
Hocum, 456 So.2d at 605.
In Hocum, the court found that the case against the defendant depended almost en *873 tirely on the witnesses’ testimony and that without it there could have been no indictment and no evidence to carry the case to the jury. Therefore, the court found that the witnesses’ credibility was an important issue in the case, and there was more than a reasonable possibility that the jury's knowledge that the witness had successfully passed a polygraph test on the subject of his testimony could have affected its judgment and contributed to its verdict. Id.
Inin the present case, at the close of the opening statements the judge admonished the jury as follows:
Ladies and gentlemen of the jury, before we proceed with the taking of evidence, I have been requested to admonish you on a principle of law. It is the judicial policy of this State to exclude polygraph evidence in criminal trial. You are not to consider any reference to the taking of a polygraph test in assessing the credibility of witnesses in this case.
Although the testimony of Pickens was very important to this case, there was testimony from Tinsley which supported the information to which Pickens testified. Further, after the reference during opening statements and the admonition by the judge, no further reference to the polygraph was made. The Defendant neither alleges nor offers any proof as to how he was prejudiced or how this error might have contributed to his conviction. Therefore, we find this argument is without merit.
ASSIGNMENT OF ERROR NOS. 2 & 5
The Defendant failed to brief assignment of error number two. Therefore, this assignment is deemed abandoned. See Uniform Rules of Court of Appeal 2-12.4. Further, Assignment of Error Number Five concerns errors patent on the face of the record which have been addressed previously.
SUPPLEMENTAL ASSIGNMENT OF ERROR
The Defendant argues the plea bargain agreement entered into between the State and Eric Pickens violates the public bribery statute, La.R.S. 14:118, which provides:
A. (1) Public bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any of the following persons, with the intent to influence his conduct in relation to his position, employment, or duty:
(a) Public officer, public employee, or person in a position of public authority.
(b) Election official at any general, primary, or special election.
(c) Grand or petit juror.
lia(d) Witness, or person about to be called as a witness, upon a trial or other proceeding before any court, board, or officer authorized to hear evidence or to take testimony.
(e) Any person who has been elected or appointed to public office, whether or not said person has assumed the title or duties of such office.
(2) The acceptance of, or the offer to accept, directly or indirectly, anything of apparent present or prospective value, under such circumstances, by any of the above named persons, shall also constitute public bribery.
B. For purposes of this Section, “public officer”, “public employee”, or “person in a position of public authority”, includes those enumerated in R.S. 14:2(9), and also means any public official, public employee, or person in a position of public authority, in other states, the federal government, any foreign sovereign, or any subdivision, entity, or agency thereof.
C. Whoever commits the crime of public bribery shall be fined not more than one thousand dollars, or imprisoned, with or without hard labor, for not more than five years, or both.
*874 The Defendant contends an offer made in an attempt to procure testimony demonstrates an intent to influence a person’s conduct and thereby purchase his testimony. The Defendant acknowledges that this court and the supreme court have ruled on this issue; however, he wishes to reassert the argument to preserve his rights in the event there are any rulings by the United States Supreme Court.
Eric Pickens was originally charged with second degree murder for the death of Ernest Prater, but he entered a plea of guilty to the reduced charge of manslaughter. In exchange for the reduced charge, he agreed to testify truthfully as to the events surrounding Prater’s death.
The issue presented in this assignment of error was recently presented to this court in State v. McCullough, 98-1766 (La.App. 3 Cir. 12/29/98); 737 So.2d 49, writ denied, 99-0259 (La.2/26/99); — So.2d-, 1999 WL 123329. In that case, the trial court suppressed the testimony of a codefendant as being illegally obtained. After being indicted, Jerry [ ^Joseph entered a plea agreement with the state whereby he provided testimony concerning the victim’s death in exchange for reduction of his charge. The basis of the defendant’s motions to suppress Joseph’s testimony was that the promises made by the state were forbidden by La.R.S. 14:118(A)(l)(d). As support for their position, the defendants cited United States v. Singleton, 144 F.3d 1343 (10th Cir.1998). This court found the trial court erred, relying on this court’s previous decision in State v. Jenkins, 508 So.2d 191 (La.App. 3 Cir.), writ denied, 512 So.2d 438 (La.1987). In Jenkins, this court noted that the appropriate avenue of relief is the cross-examination of the testifying codefendant. In reaching its decision in McCullough, this court additionally relied on the fact that the Singleton decision has not been followed by all of the federal circuits and in fact had been most recently vacated, in an en banc hearing[1], by the circuit that originally rendered the decision. Furthermore, this court noted that recently the U.S. Fifth Circuit in United States v. Haese, 162 F.3d 359 (5th Cir.1998), refused to follow Singleton’s reasoning and holding. Thus, we find this assignment also without merit.
Accordingly, for the reasons stated above, the Defendant’s conviction and sentence are affirmed. The district court is directed to inform the Defendant of the provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.
AFFIRMED.

. On the en banc rehearing the court went against its earlier ruling and held 18 U.S.C. § 201(c)(2) did not apply to the United States or an Assistant United States Attorney offering leniency in exchange for truthful testimony. U.S. v. Singleton, 165 F.3d 1297 (10th Cir.1999).