**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**23-313**

**STATE OF LOUISIANA**

**VERSUS**

**ANTOINE DENTON**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 21-K-3942-C
HONORABLE GREGORY J. DOUCET, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

**AFFIRMED.**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Antoine Denton**

**Chad Pitre**
**District Attorney**
**Kathleen E. Ryan**
**Assistant District Attorney**
**Twenty-Seventh Judicial District**
**P.O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-3041**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**KYZAR, Judge.**

Defendant appeals his conviction for second degree murder, asserting that the evidence was insufficient to support the verdict. For the reasons herein, we affirm the conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On October 24, 2021, police responded to an alleged shooting at the Townhouse Motel in Opelousas, Louisiana, wherein the victim, Jonas Hubbard, was found dead, lying face down in the parking lot. On December 9, 2022, Defendant, Antoine Denton, was charged by a bill of indictment with second degree murder, in violation of La.R.S. 14:30.1, and with possession of a firearm by a convicted felon, in violation of La.R.S. 14:95.1. He was also charged on the same day by a bill of information with possession of a Schedule II controlled dangerous substance, crack cocaine, in violation of La.R.S. 40:967(C), and introduction of contraband in a penal institution, in violation of La.R.S. 14:402. On December 28, 2021, the State filed an amended bill of indictment, again charging Defendant with second degree murder and possession of a firearm by a convicted felon. On January 6, 2022, Defendant entered a plea of not guilty. Trial on the second degree murder and firearm possession charges commenced with jury selection on January 10, 2023. On January 12, 2023, a unanimous jury found Defendant guilty as charged on both counts.

On March 2, 2023, the trial court sentenced Defendant to mandatory life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence, for the second degree murder. It also sentenced Defendant to twenty years at hard labor, without the benefit of probation, parole, or suspension of sentence, for possession of a firearm by a convicted felon and ordered the two sentences to run concurrently.

Defendant now appeals his conviction and sentence for second degree murder, alleging only that the State's evidence was insufficient to prove beyond a reasonable doubt that he was guilty of second degree murder. He does not appeal his conviction, or sentence for the firearm possession conviction.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent.

Defendant was convicted of possession of a firearm by a convicted felon, and was sentenced to twenty years at hard labor, without the benefit of probation, parole, or suspension of sentence, with the sentence to run concurrent with the sentence for second degree murder. Louisiana Revised Statutes 14:95.1(B) provides that one found guilty of possession of a firearm by a convicted felon "shall be imprisoned at hard labor for not less than five nor more than twenty years without the benefit of probation, parole, or suspension of sentence and be fined not less than one thousand dollars nor more than five thousand dollars."

The trial court failed to impose the fine as required by La.R.S. 14:95.1. Thus, Defendant's sentence for possession of a firearm by a convicted felon is illegally lenient. However, this court will not consider an illegally lenient sentence unless it is a raised error. *State v. Aguillard*, 17-798 (La.App. 3 Cir. 4/11/18), 242 So.3d 765, *writ denied*, 18-1207 (La. 3/6/19), 266 So.3d 897.

## DISCUSSION

In his sole assignment of error, Defendant argues that the State's evidence was insufficient to prove beyond a reasonable doubt that he was guilty of second degree murder. Specifically, he contends that the State failed to prove he committed second degree murder, inasmuch as the homicide at issue was committed in self-defense and

2

was justified. Alternatively, Defendant argues that the killing was manslaughter or even negligent homicide rather than second degree murder.

The analysis for insufficiency of evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

In the instant case, Defendant was charged with second degree murder. Louisiana Revised Statutes 14:30.1 defines second degree murder as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. Specific intent is defined as the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1).

### Sufficiency of the Evidence

Doctor Yen Van Vo, who was accepted as an expert in the field of forensic pathology, testified that after she performed the autopsy on the victim, she determined that the cause of death was a gunshot wound to the chest and that the manner of death was homicide.[1] Dr. Vo stated that the gunshot wound was caused

---

[1] Coroner's investigator Mark Dupont also testified that he examined the victim, documented the victim's wounds, took pictures of the victim, transported the victim to the forensic

3

by a bullet that entered the right of the victim's chest, traveled across his chest—puncturing his right and left lungs, aorta, and trachea and causing internal bleeding—and became wedged in his armpit area. Dr. Vo indicated that the toxicology report revealed the presence of cocaine, and its byproduct, benzoylecgonine, in the victim's system, but that these substances were not related to the cause of death.

Ebony Martin, a lieutenant with the Opelousas Police Department (OPD), testified that when she arrived at the Townhouse Motel, she observed a deceased male subject lying face down on the pavement, with blood secreting from his body. Lieutenant Martin stated that she instructed Officer Shawn Taylor, one of the officers at the scene, to review the motel's surveillance footage and, shortly thereafter, she encountered a white male subject, identified as Robert Benoit, who stated that he saw a male with a gun retreat to his room following the gunshots.[2]

Lieutenant Martin stated that after learning that Defendant was still in his room, Room 209, she and Officer Christopher Dekerlegand went to the room and detained him and that once detained, he was searched, *Mirandized*,[3] and questioned by Officer Dekerlegand. Lieutenant Martin testified that Defendant admitted to shooting the victim through the door when he persisted in knocking on the door despite being told to go away. Defendant did not relate that he was afraid of the victim, nor did he indicate that he called for help before or after the shooting.

---

center, and concluded that the victim's cause of death was a gunshot wound to the chest due to homicide.

[2] Ricky Leger, an investigator with the District Attorney's Office, testified that he served a trial subpoena on Mr. Benoit. However, Mr. Benoit failed to appear in court for the trial despite the subpoena.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

4

Lieutenant Martin also observed a firearm on the room's bed, along with two spent .357 caliber rounds, two .38 caliber rounds, and three live rounds.[4]

Officer Dekerlegand, a patrol officer with the OPD, testified that when he arrived at the scene, he found the victim lying in the parking lot surrounded by a puddle of blood. After learning of Defendant's whereabouts, he and Lieutenant Martin apprehended him in his room and then *Mirandized* and searched him. While searching Defendant, a bullet was located on him, which they placed with the others found on the bed. Officer Dekerlegand stated that Defendant said he shot twice through the door after the victim continued knocking on the door despite being told multiple times to leave. He testified that Defendant admitted to knowing the victim but that he failed to elaborate further on their relationship.

Officer Taylor testified that when he arrived at the scene, he found the victim in the parking lot, lying in a pool of blood. He explained that he was instructed by Lieutenant Martin to review the motel's video surveillance footage, which he described in the following colloquy:

Q.   Okay, and what did you observe while watching the surveillance?

A.   Um, viewing the surveillance I could see the shooter actually walking from towards the office where I was observing the video surveillance. He walks to Room 209. I see him go in the room, probably within seconds I can see the victim trailing along. At that time, the victim knocked on the door, he kind of looked around as if he was looking for someone, he hadn't left the area though, then he knocked again the second time and you can see he put his ear closer to the door as if he was listening for something, probably seconds later the shooter shoots through the door, the victim takes off running and he collapses in the parking lot.

Q.   Okay. Um, how did you know that that was the victim that you were watching on the surveillance footage?

---

[4] Another law enforcement witness later clarified that one of the two spent rounds was a .38 caliber round, while the other was a .357 caliber round.

5

A.   Um, it was several camera uh several cameras that captured different areas, so I watched one for when they walked to the room, then I watched another where the victim collapsed.

Q.   Okay, and when you arrived on scene the victim that you saw in the parking lot in a pool of blood, was that the same victim that you saw on the surveillance?

A.   Yes.

Q.   And were they dressed the same, how did you identify that?

A.   Well, I mean I seen him fall in the parking lot and I watched him run from towards the room to the parking lot.

Q.   Okay, so you watched him on surveillance video essentially fall in the location that you observed when you arrived on scene?

A.   Yes.

Q.   Okay. Did you inform anybody else what you had observed on that surveillance footage?

A.   Yes, I radioed the other officers on my portable radio and at that time I advised them that the shooter was still in the room. I continued to watch more of the video and he hadn't left. He walked outside of the room, he walked to the area where the victim was, he looked at the victim and um he walked back towards the room casually and just went in the room.

Q.   Okay, and you watched that footage from the time of the shooting until when?

A.   I don't know a specific time, but until we arrived.

Q.   At that point, you did not see the suspect leave the room?

A.   No.

Q.   Okay, and he remained in there when you guys got there?

A.   Yes.

Brandon Harris, a sergeant with the OPD and the lead investigator in this matter, testified that when he arrived at the scene, he observed the victim's body lying uncovered on the ground. He then learned that Defendant had been detained after surveillance footage revealed that he had entered Room 209 following the

6

shooting. Sergeant Harris testified that he was informed that Mr. Benoit, a witness, heard the gunshots, saw the victim lying on the ground, and, when approached by a male subject with a firearm, retreated back into his room to await the arrival of the police.

In reviewing the surveillance footage, Sergeant Harris identified Defendant as the individual standing with a gun in his hand and the victim as the individual lying on the ground, who was wearing a green T-shirt, blue jeans, black crocs and had a pink backpack. In reviewing the surveillance footage prior to the shooting, he stated that Defendant approached and entered Room 209, and shortly thereafter, the victim approached the room and proceeded to knock on the door. Sergeant Harris explained that two shots were subsequently fired through the door, after which the victim ran and then collapsed onto the ground. He noted that Mr. Benoit exited his room and appeared to speak with someone, and that Defendant approached the victim's body as it was lying on the ground.

A review of the surveillance footage shows that Defendant entered his room at the 19:37:38 mark, and approximately sixteen seconds later, the victim approached the same room and normally, not aggressively, knocked on the door. Approximately ten seconds later, the victim took about five steps away from the door. He then turned back toward the door and, when about a foot from the door, he appeared to lean towards the door as if trying to listen; this occurs at the 19:38:14 mark. At the 19:38:21 mark, the victim again knocked on the door in a normal, nonaggressive manner. Three seconds later, shots were fired through the door. As noted in Sergeant Harris's testimony, the victim, after being shot, ran and then collapsed in the parking lot. Approximately two minutes and eleven seconds later, Defendant calmly walked out of his room in the direction of the victim's body and then turned around and went back into his room.

7

Sergeant Harris did not recall seeing the victim with a weapon in the surveillance footage, nor was a weapon found on his body or in his backpack after they were searched. He testified that whenever the victim appeared in the footage, he neither banged on Defendant's door nor tried to forcefully enter his room. This was confirmed by the surveillance footage.

Sergeant Harris testified that when he arrived at the scene, the victim was lying face down on the ground, with a dollar bill lying on the ground to the left of his body. He stated that he photographed the body, and, after reviewing the photographs, he affirmed that no weapons were found on the victim or in his backpack. He further noted that the victim had a gunshot wound to the upper right side of his chest, with a bulge near his left armpit. Sergeant Harris further observed a firearm, ammunition, and a cell phone at the scene. He stated the gun was a .357 magnum with a black handle, and there were two spent casings in front of it, one a .357 caliber and the other a .38 caliber. Regarding the cell phone, Sergeant Harris recalled it to be an AT&T flip phone that was in proper working order and capable of making calls. He also noticed two mushroom-shaped exit holes on the exterior of the room's door, one at the top and the other at chest level. There was only one entrance/exit door for the room. Sergeant Harris also described a room key from a photo taken at the scene, which Defendant used to open the door prior to the shooting. He noted that the door's lock was working that night and could be locked from either inside or outside the room.

Sergeant Harris testified that he and Officer Taylor interviewed Defendant after reading him his *Miranda* rights. Although Defendant indicated that he understood his rights and that he did not wish to make a statement, he proceeded to make unsolicited statements. Sergeant Harris described Defendant's statements as follows:

8

Q. Okay, and what statements did he make to you?

A. After he was advised of his rights[,] he stated at some point it didn't pay to talk because one of the officers had told him they had it on film. He proceeded on and stated that he didn't know why the victim came over to his room and things like that, I don't remember it verbatim, but it was stuff pertaining to that.

During cross-examination, Sergeant Harris testified that based on his recollection of the surveillance footage, the victim was jogging towards Defendant as if trying to approach him and that it seemed as though the victim knew Defendant due to his comfortable manner.[5] He testified he later learned that the victim and Defendant practically grew up together but that he never received clarification as to the reason the victim followed Defendant that night. Additionally, Sergeant Harris testified that he did not believe Defendant's actions were justified because the victim never displayed any type of violent or aggressive behavior. When called by the defense, Sergeant Harris stated that in his review of the surveillance footage, he did not see anyone other than Defendant and the victim go to Room 209.[6]

Steven Richardson, a forensic chemist with the Acadiana Criminalistics Laboratory, was accepted as an expert in the field of firearms. He identified an evidence box containing a firearm, two plastic bags containing cartridge cases, another small plastic bag containing cartridges, and a test-fire envelope. He identified the firearm recovered at the motel as a Rossi revolver,[7] model number M971, and determined that it was functional and capable of use. He also completed a test fire of the firearm, and he confirmed that the spent shell casings found at the

---

[5] Our own review of the video surveillance shows that the victim was simply walking towards Defendant rather than jogging.

[6] The defense also called Mary Denton, Defendant's mother, but because she was present during the testimony of other witnesses on the first day of the trial, in violation of a sequestration order, she was not allowed to testify.

[7] In the transcript, the name of the revolver was misspelled as "Wassie."

9

scene were fired by the Rossi revolver. He further confirmed that the revolver in question was capable of firing both .38 caliber and .357 caliber rounds. Mr. Richardson also identified the two bullet fragments recovered from the victim's body, which he tested after they were submitted to him for analysis by OPD. He explained that he did not determine whether the two fragments were part of the same bullet; however, he concluded that the bullet jacket fragments taken from the victim were, in fact, fired from the firearm submitted into evidence.

Treles Hubbard Drawsand, the victim's sister, identified him as the individual killed. She further testified that she did not know why her brother was at the Townhouse Motel on the night in question.

Considering the totality of the evidence adduced at trial, we find it more than sufficient to prove all the elements of second degree murder. The evidence shows beyond any doubt that Defendant fired his gun multiple times through the door, knowing that the victim was knocking directly on the other side, and thus, could or would be killed or, at the least, could suffer great bodily harm. "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437. Specific criminal intent can be formed in an instant. *State v. Johnson*, 21-403 (La.App. 3 Cir. 2/23/22), 335 So.3d 930. "Specific intent to kill may also be inferred from a defendant's act of pointing a gun and firing at a person." *State v. Reed*, 14-1980, p. 21 (La. 9/7/16), 200 So.3d 291, 309, *cert. denied*, __ U.S. __, 137 S.Ct. 787, 197 (2017). "The fact that multiple shots are fired at a victim indicates a defendant's culpable state of mind and satisfies the specific intent to kill requirement for murder." *State v. Poullard*, 03-940, p. 21 (La.App. 3 Cir. 12/31/03), 863 So.2d 702, 718, *writ denied*, 04-908 (La. 3/18/05), 896 So.2d 995. "The determination of whether the requisite intent is present in a criminal case is for the trier of fact[.]"

10

*State v. Evans*, 98-1850, p. 3 (La.App. 3 Cir. 5/5/99), 734 So.2d 866, 869, *writ denied*, 99-1616 (La. 12/17/99), 751 So.2d 871.

We note that in *State v. Jerico*, 22-251, p. 27 (La.App. 3 Cir. 11/16/22) (unpublished opinion), we affirmed a defendant's convictions for the attempted first degree murder of eight police officers on sufficiency grounds wherein the defendant fired his gun through the walls, a door, and a window of a hotel room while the law enforcement officers were on the other sides of those respective areas. The defendant argued that the State failed to prove his intent to kill the officers as "a gun was not pointed or aimed directly at anyone." This court found the evidence proved that the defendant "was firing 'blindly' in an attempt to kill the officers on the scene" and that "[t]he fact that none were in his direct line of fire, evidenced by the fact none were hit, does not negate the fact that he had a specific intent to kill those who were there to arrest him." *Id.* at 29.

In this case, the victim was directly on the other side of the door, and knocking on the door at the time he was shot and killed. We find this to be more than Defendant blindly firing his weapon and more than sufficient to support the jury's finding that he specifically intended to either kill the victim or inflict great bodily harm as required to prove second degree murder. This does not end our inquiry, however, as Defendant claims the State failed to prove that he was not acting in self-defense at the time of the shooting.

### *Justification/Self-Defense*

Defendant contends that he was justified in shooting the victim as the State failed to prove that he did not act in fear of receiving great bodily harm or death. He asserts that he shot twice through the door to stop any intrusion into his room since the victim did not leave after he repeatedly requested him to do so. Additionally, Defendant indicates that there was no back door for him to retreat through, no peep

11

hole in the door of his room so he could not know where the victim was standing, and no audio on the videos so "there is no telling if [the victim] was making any threats towards [Defendant]." Thus, he argues that he was justified in shooting the victim.

The State, in contrast, argues that Defendant was not justified in the killing of the victim, asserting that the evidence and testimony presented during trial demonstrated that he had no reasonable belief to feel as though he was in imminent danger of losing his life or receiving great bodily harm. Additionally, the State contends that Defendant never made any statements to the investigating officers regarding his fear of the victim when he voluntarily made statements after being advised of his rights.

When a homicide defendant claims self-defense, the State has the affirmative burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense; a defendant does not assume a burden of proving self-defense. *State v. Lynch*, 436 So.2d 567, 569 (La.1983). This court, in *State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16-404 (La. 3/13/17), 216 So.3d 800, discussed the factors to be considered in examining a self-defense claim, as follows:

> "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La. 11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

12

In *State v. Mincey*, 08-1315, pp. 2–3 (La.App. 3 Cir. 6/3/09), 14 So.3d 613, 615 (alteration in original), this court explained:

> Defendant does not deny that he shot and killed the victim, nor did he deny it at trial. Rather, he argues that the State failed to disprove that he acted in self-defense. Killing in self-defense is governed by La.R.S. 14:20(A), which states, in pertinent part, "[a] homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." (Emphasis added).

> Defendant contends that the killing was justifiable because he had his back against the wall, and was surrounded by the victim and the victim's two friends, Doucet and Jones. Further, he contends that shooting the victim was the only way he could escape.

> The Defendant's claim that Jones had a firearm was disputed by both Doucet and Jones at trial. The evidence given by his own mother defeats his claim of justifiable self-defense. The essence of his defense is that he was justified in responding to an attempted punch by shooting his opponent in the chest at close range. We recognize that Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances.

> In the context of self-defense in a manslaughter prosecution, our court has observed in *State v. Griffin*, 06-543, pp. 12, 14 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, 851, 854, *writ denied*, 07-2 (La.9/14/07), 963 So.2d 995, the following:

>> The State had the burden of proving the Defendant did not stab Marcus Conway in self-defense; therefore, we must determine whether the Defendant reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that killing Marcus was necessary to save himself from that danger. The standard in La.R.S. 14:20 is whether the Defendant's subjective belief that he was in danger was reasonable. *State v. Brown*, 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488.

>> Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Hardeman*, 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to

13

consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Brown*, 414 So.2d 726 (La.1982).

*State v. Spivey*, 38,243, p. 6 (La.App. 2 Cir. 5/12/04), 874 So.2d 352, 357.

We find that Defendant's act of shooting the victim through the door of his motel room was not justified pursuant to La.R.S. 14:20. There was no evidence to indicate that the victim used or attempted to use force to get inside Defendant's motel room. The door had a locking mechanism, as shown by Defendant using a key to gain access prior to shooting the victim. There was no evidence that the victim was armed with any dangerous weapon. There was no evidence of any excitement and/or confusion surrounding the situation that would warrant the use of force or violence of any kind, given that the victim simply walked to Defendant's door and knocked. After the shooting, Defendant calmly walked out of his motel room and observed the victim lying on the ground before going back inside his room. While there was some testimony that the two may have been long-time acquaintances, there was no evidence of any dispute between them, past or present. Moreover, Defendant never made any statements to the authorities demonstrating that he felt threatened by the victim, even though he voluntarily spoke with them after the shooting. In short, the victim simply knocked on the door and waited for Defendant to open it, but instead, the victim received a bullet to the chest which caused his death.

As noted in *Mincey*, one of the factors to be considered in determining whether a defendant had a reasonable belief that the killing was necessary is the possibility of using force or violence short of killing. Responding to knocks on one's motel room door by shooting through the door, even after telling the person to go away, is clearly an excessive response under the facts. While Defendant argues that he was justified in the shooting, the evidence does not support his argument.

14

Under the facts and circumstances presented in this case, we find that the jury rationally determined that the force used by Defendant was neither reasonable nor apparently necessary to prevent an offense against him. Again, although the State proved beyond a reasonable doubt the elements of second degree murder and that the killing was not justified, our inquiry continues as Defendant claims that the killing was committed in sudden passion or heat of blood under provocation, such that the jury should have returned a manslaughter verdict.

### *Responsive Verdict of Manslaughter*

Defendant argues that the evidence presented at trial supports a conviction of manslaughter, not second degree murder. Louisiana Revised Statutes 14:31(A)(1) defines manslaughter, in pertinent part, as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

In *State v. Stewart*, 00-143, pp. 3–4 (La.App. 3 Cir. 10/4/00), 771 So.2d 723, 726, *writ denied*, 00-3135 (La. 11/2/01), 800 So.2d 866, this court discussed the responsive verdict of manslaughter, as follows:

> When the fact finder, in this case, the judge, finds the elements of second degree murder, it then must be determined whether the circumstances indicate the crime was actually manslaughter. *State v. Jack*, 596 So.2d 323 (La.App. 3 Cir.), *writ denied*, 600 So.2d 611 (La.1992). To reduce second degree murder to manslaughter, a defendant must present evidence to show by a preponderance that the homicide was committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. *State v. Lee*, 498 So.2d 1177 (La.App. 3d Cir.1986), *writ denied*, 504 So.2d. 874 (La.1987). "Sudden passion" and "heat of blood" are not elements of the crime of manslaughter. They are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the

15

occurrence of any extenuating event. *State v. Lombard*, 486 So.2d 106 (La.1986).

In *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319 (1977), the Supreme Court upheld the constitutionality of a New York statute requiring a defendant to prove extreme emotional distress in order to reduce a charge of murder to manslaughter. "Louisiana has followed the *Patterson* rule that defendant must prove the mitigating factors of sudden passion or heat of blood to reduce a homicide to manslaughter." *State ex rel. Lawrence v. Smith*, 571 So.2d 133, 136 (La.1990). Having found the elements of second degree murder, the jury must then determine whether the circumstances indicate that the crime was manslaughter. *State v. Jack*, 596 So.2d 323 (La.App. 3 Cir.), *writ denied*, 600 So.2d 611 (La.1992). "When the preponderance of the evidence shows that a homicide was committed in sudden passion or heat of blood which would have deprived an average person of his self control and cool reflection, a jury errs in rendering a verdict of second degree murder." *State ex rel. Lawrence v. Smith*, 571 So.2d at 136.

In *State v. Humphrey*, 22-724 (La.App. 3 Cir. 3/29/23), 364 So.3d 437, this court considered the defendant's appeal wherein he argued that the evidence presented at trial supported that he was guilty of manslaughter, not murder. Therein, we stated:

> On appeal, the question for the reviewing court is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence. In brief to this court, appellate counsel asserts this is not a case where one individual is significantly bigger than the other, and both Defendant and Ms. Vital were under the influence of drugs and alcohol at the time of the incident. Appellate counsel speculates there was some sort of catalyst during their "night of debauchery," which led to Defendant's hand being injured and then to Ms. Vital's death.
>
> However, as the State correctly argues, there was little evidence presented of provocation by Ms. Vital. In closing arguments, defense counsel surmised that Ms. Vital may have mentioned one of her ex-

16

boyfriends, which sent Defendant into a jealous rage or upset Defendant in his intoxicated state. Arguments of counsel are not evidence. Further, even accepting defense counsel's assertion, it is well-settled that "an argument alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter." *State v. Charles*, 00-1611, p. 4 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, 519 (citations omitted), *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420. Nothing in the record suggests Ms. Vital initiated the confrontation, provoked Defendant, or engaged in aggressive behavior. Viewing the evidence in a light most favorable to the prosecution, a rational jury could have found that Defendant failed to show by a preponderance of the evidence that he acted in sudden passion or heat of blood to justify the lesser verdict of manslaughter.

*Id.* at 446–47.

Here, as in *Humphrey*, there was no evidence offered by Defendant establishing anything close to a preponderance of the evidence that the killing of the victim was the result of provocation causing sudden passion or heat of blood. He only provides speculation, arguing in his brief that no one knows if the events leading up to the shooting were sufficient to deprive anyone of his self-control and cool reflection. He contends that the surveillance video shows the victim running behind him as Defendant entered his room, when in fact he is walking. Defendant also argues that even though a weapon was not found on the victim when the authorities searched his body, someone else, possibly Mr. Benoit, could have removed it. All of this is speculation and argument, not evidence. The actual evidence, the surveillance footage, does not in any way support Defendant's arguments. It clearly shows that from the time the victim collapsed in the parking lot and the police arrived on the scene, no one went close enough to the body to remove a weapon. Several minutes after the shooting, a woman and a child pass by the body but do not even stop. In fact, the woman gestured to the child to keep walking. A man in a room near to where the victim collapsed, exited his room several minutes after the shooting. He did not even get close to the body.

17

The trial court gave instructions to the jury allowing it to convict Defendant of a lesser offense, such as manslaughter, if it deemed he was not guilty of second degree murder. However, the jury decided that Defendant was guilty of second degree murder beyond a reasonable doubt. We have affirmed that decision. In doing so, the jury found that Defendant failed to show by a preponderance of the evidence that he acted in sudden passion or heat of blood to justify the lesser verdict of manslaughter. Based on the total lack of evidence that this homicide was committed by Defendant as a result of provocation sufficient to cause sudden passion or heat of blood, justifying the lesser verdict of manslaughter, there is no error in the jury's verdict.

### Responsive Verdict of Negligent Homicide

Defendant also contends that under the circumstances of the case, a conviction of negligent homicide, an additional responsive verdict to second degree murder, is appropriate. Louisiana Revised Statutes 14:32(A)(1) defines negligent homicide, in pertinent part, as "[t]he killing of a human being by criminal negligence." "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of other that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:12. The offense of negligent homicide is not an intentional crime, and intent is not an element of negligent homicide. *State v. Guillot*, 277 So.2d 146 (La.1973).

Having already concluded that the evidence was sufficient to establish all the elements of second degree murder, including its requirement of specific intent to kill or inflict great bodily harm, Defendant's arguments as to negligent homicide are moot. Accordingly, Defendant's conviction for second degree murder and his

18

sentence of life in prison without the benefit of probation, parole, or suspension of sentence are affirmed.

## DECREE

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

19