# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-468


**STATE OF LOUISIANA**

**VERSUS**

**TYLER N. DEROCHOWSKI**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2022-408
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## GUY E. BRADBERRY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Candyce G. Perret, Jonathan W. Perry, and Guy E. Bradberry, Judges.


**CONVICTION AND SENTENCE AFFIRMED;
REMANDED WITH INSTRUCTIONS.**

**J. Michael Small**
**Law Offices of J. Michael Small**
**P.O. Box 12720**
**Alexandria, Louisiana 71315**
**(318) 487-8963**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Tyler N. Derochowski**

**Annette F. Roach**
**Roach & Roach, APLC**
**P.O. Box 6547**
**Lake Charles, Louisiana 70606**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Tyler N. Derochowski**

**David L. Wallace**
**Attorney at Law**
**518 North Pine Street**
**DeRidder, Louisiana 70634**
**(337) 462-0473**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Tyler N. Derochowski**

**James R. Lestage**
**District Attorney**
**Richard A. Morton**
**Adam M. Bone**
**Assistant District Attorneys**
**Thirty-Sixth Judicial District**
**P.O. Box 99**
**DeRidder, Louisiana 70634-0099**
**(337) 463-5578**
**COUNSEL FOR:**
    **State of Louisiana**

**BRADBERRY, Judge.**

Defendant, Tyler N. Derochowski, was charged by grand jury indictment with the second degree murder of Ashley Fish, a violation of La.R.S. 14:30.1. By unanimous vote, a jury convicted him of the charged offense. Defendant subsequently filed a motion for new trial, which was denied by the trial court prior to its imposition of a life sentence at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant is before this court appealing his conviction alleging three assignments of error. For the reasons that follow, Defendant's conviction is affirmed. Additionally, we remand this matter to the trial court for it to amend the Uniform Commitment Order.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent present; however, Defendant's Uniform Commitment Order requires correction.

Both the sentencing transcript and court minutes reflect that Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence, yet the Uniform Commitment Order indicates that the court imposed a sentence of 999 years.

In *State v. Coutee*, 22-345, p. 10 (La.App. 3 Cir. 10/26/22), 353 So.3d 210, 219, this court required correction of this inaccuracy in the commitment order:

> Additionally, we find that the Uniform Commitment Order needs correction as to count one as well. According to the transcript and the minutes of sentencing, the trial court sentenced Defendant on count one (first degree rape) to life at hard labor, without benefit of parole, probation, or suspension of sentence. The Uniform Commitment Order, however, indicates the sentence imposed for first degree rape was 999 years. In *State v. Bringier*, 21-476, p. 2 n.1 (La.App. 1 Cir. 12/30/21),

340 So.3d 975, 977, *writ denied*, 22-157 (La. 4/5/22), 335 So.3d 837, the first circuit noted this identical issue in a footnote:

> The commitment order reflects a sentence of 999 years. The sentencing minutes and sentencing transcript, however, reflect a sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The sentencing transcript prevails in the event of a discrepancy in the record concerning the sentence. *See State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

Accordingly, the trial court is instructed to amend the Uniform Commitment Order to reflect the life sentence imposed, without benefit of parole, probation, or suspension of sentence.

Thus, this court instructs the trial court to amend the Uniform Commitment Order to correctly reflect the sentence imposed in this case.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant first challenges the sufficiency of the circumstantial evidence presented at trial claiming it was insufficient to prove beyond a reasonable doubt that he fired the shot that killed the victim, Ashley Fish, and that he had the specific intent to kill or inflict great bodily harm.

At trial, Officer Gladys Santiago, a DeRidder Police Department dispatcher, received a call from Defendant on the evening of April 7, 2022. He told her he had shot his girlfriend Ashley Fish and needed to turn himself in. He did not request help, medical attention, or an ambulance. After Officer Santiago obtained the address where the shooting occurred, she dispatched Officer Cameron Smith and Corporal Joshua Sanford while she stayed on the line with Defendant.

In the transcript of the 911 call, Defendant stated that he needed to turn himself in because he had just committed a crime. He stated that he shot somebody at their house, and he was waiting in the parking lot of Burks Outlet to be picked up. He provided the address of the shooting and a description of what he was wearing so police could locate him when they arrived.

2

Defendant told Officer Santiago that he left the gun at the house, and the woman he shot was Ashley Fish, his girlfriend of two years. He was asked if there was anyone else involved, and he told Officer Santiago that there were kids at the house that needed someone with them. When asked about the victim's condition, Defendant said he shot her about ten minutes before and that she was not breathing when he left. He then clarified that he did not check on the victim, but he thought she was dead. Defendant told Officer Santiago that the victim was in the bathroom, the bathroom door was locked, and he had unloaded the clip.

One of the two officers dispatched, Corporal Stanford, responded to the victim's home where he was met by the victim's oldest daughter who told him that her mother was in the bedroom. Corporal Stanford entered the master bathroom off the master bedroom and saw the victim lying on her left side with a cell phone in her right hand. Her head was surrounded by a pool of blood. On the top of the nearby bathroom vanity, there was a semi-automatic firearm with a magazine lying next to it. An empty shell casing was found close to the victim's head, and an unspent shell was found on the floor near the vanity. Corporal Stanford observed no bullet defects on the wall nor any blood spatter. The victim's body bore no visible wounds. There was no sign that a struggle had occurred, and nothing appeared out of place.

Once Corporal Stanford got the victim's children safely to a neighbor's house, he re-entered the residence joined by other officers who had arrived on the scene. It was determined that the Beauregard Parish Sheriff's Office (BPSO) had jurisdiction over the case.

On cross-examination, Corporal Stanford testified that he found a gun holster on the bed in the master bedroom, which was adjacent to the master bathroom where

the gun was found. The holster type was consistent with the type of gun found in the bathroom.

Officer Smith with the DeRidder Police Department went to Burks Outlet where the suspect was located. Officer Smith placed Defendant in the rear of his patrol car and read him his *Miranda* rights, which Defendant indicated he understood. Defendant told Officer Smith that he had been in an argument with someone, and as a result, the person had been shot. He indicated that he unloaded the weapon and left it on the bathroom counter. Officer Smith observed no injuries or marks on Defendant, and Defendant did not appear concerned or upset. He asked for neither medical attention nor help.

> Portions of Defendant's statements to Officer Smith detail what occurred:
>
> We got in an altercation last night, this woman and I got in an altercation last night over, I've been staying the night, staying the night at this woman's place, I've been in her life for two years.
>
> . . . .
>
> She's been going through a separation with her spouse and in their legal paperwork, you're not allowed to, I'm not allowed to spend the night, I've been spending the night, things were kind of falling out between the two of us just relationally and I was getting ready to move back to Oregon.
>
> . . . .
>
> I have a, a wife I just uh, divorced about a year ago and was going to go back home to that, she was going to kind of figure things out with her spouse that she's separating with now, we got in a big altercation last night over me telling the spouse the truth about me spending the night because I was going to f_ _ k up her life and make it so that in the legal paperwork technically she could go to prison or she could get fined, have time away from her kids, so she pulled out, she had a gun in her drawer, she had loaded it and was pointing it at me, I didn't, I let it go last night and we got into another altercation today, we both-
>
> . . . .

I would say it was about 6:00 PM whenever; I mean I placed the call, I don't remember how long it's been (inaudible) how much time has passed or whatever, but yeah, about 6:00 o'clock um, today we was looking at me possibly leaving the house to go home, I was packing up my stuff. I threatened again about calling her husband and letting him know the truth and she freaked out, she got her gun again, we were in the bathroom, and we started fighting, and it f _ _ k went off.

BPSO Detective Douglas Cooley testified that he responded to the scene of the shooting. Once inside the house, he observed a gun holster on the bed, and the victim was on the floor in the bathroom on her left side. Detective Cooley's observations regarding the blood, the empty shell casing, and the live round were much the same as Corporal Stanford's; however, Detective Cooley observed a gunshot wound behind the victim's right ear. There was no sign that the victim's body had been disturbed, moved, or touched. As for his observations of the bathroom itself, Detective Cooley noted that there was a hair dryer, hairbrush, and toothbrush on the vanity. Hanging on the wall opposite the victim's body were a towel rack (with towels hanging) and a jewelry holder. A shampoo rack and laundry basket were standing up in the bathroom as well. On the counter were toiletries and hygiene items sitting undisturbed.

When Detective Cooley interviewed Defendant, he told Detective Cooley that he had been involved in a fight for his life with the victim in her bathroom. However, the condition of the items in the bathroom did not, in Detective Cooley's opinion, indicate that Defendant had been in a fight for his life while struggling over a gun. There was no broken glass or damage to the walls, and there was no blood anywhere but under the victim's head. The victim was right-handed, and in her right hand she was holding a cell phone.[1] Therefore, Detective Cooley agreed that if the victim had

---

[1] The victim's mother, Sheila Krebsbach, confirmed at trial that the victim was right-handed.

5

a pistol, it would have been held in her non-dominant left hand. A long black hair consistent with the victim's was found trapped in the slide of the gun. After the victim's body was moved, a bullet fragment was found on the floor where the left side of the victim's head had been.

The prosecutor lay on the courtroom floor and demonstrated the position in which the victim was found. The following exchange ensued:

Q      Now if I were in a struggle over this pistol, what side of my head would this bullet have to enter my head at?

A      It would have to enter on your right side.

Q      Detective Cooley, would this be able [sic] accurate if I were in a struggle based on the defendant's statement?

A      No, sir.

Q      Why not?

A      Given the trajectory of the bullet and the evidence collected, the bullet when coming out of the head entered the floor.

Q      And so what you're suggesting then is I would actually need to have my head further down on the floor, like this.

A      Correct.

Q      And this is the position I would to [sic] be in for the defendant's statement to be accurate about a gun going off during a struggle.

A      Correct.

Q      And very briefly, Detective Cooley, I'm going to do this standing up. If this pistol were still in my right hand for anyone who could not see, it would still have to come around the front of my face.

A      That is correct.

Q      In order to reflect accurately what the defendant said happened.

A      Correct.

Q      That last question that I'm going to ask you, Detective Cooley, is about the defendant's statement about guns in general. Did he tell the

detectives, mainly you in the interview, that he was terrified of weapons?

A    Yes.

Q    Was the weapon unloaded, emptied and cleared?

A    Yes.

Q    Did the defendant admit that he unloaded that weapon?

A    He did.

Q    Did the defendant admit that he unloaded that weapon?

A    He did.

Detective Cooley interviewed Defendant at the BPSO around 8:00 p.m. after he was picked up by police.  After Mirandizing Defendant both verbally and in writing, Detective Cooley obtained a waiver and proceeded to question Defendant. During the interview, Defendant told him that he first met the victim through an online application.  The two met and became involved in a relationship which evolved into a physical one.  Defendant left his wife, and the victim separated from her husband, Josh Fish.  The victim moved back to DeRidder after her separation, and in 2021, Defendant moved from his home state of Oregon to live with the victim in DeRidder.  The relationship eventually became rocky after the two began fighting, and Defendant planned to return to Oregon.  On the day the victim was killed, Defendant had packed his truck, and he and the victim had a physical altercation, which originated in the bedroom but proceeded to the bathroom, where it got "ugly."

According to Defendant, the fight started when he threatened to call the victim's ex-husband to let him know that he had been staying at the victim's residence.  His intention was to hurt the victim's custody arrangement.  According to Detective Cooley, Defendant called Josh Fish around 4:30 p.m., and a fight ensued

7

during which the victim pulled a gun on him. Detective Cooley asked Defendant why he did not leave when she pulled the gun on him, and he could not answer. Defendant left the residence at 6:18 p.m. after the shooting.

Defendant told Detective Cooley that a few days prior to this incident, he threatened to tell the victim's ex-husband that he had been staying at the residence. The victim retrieved a gun from her nightstand, waved it around, loaded it "by racking it back," and told Defendant that was not going to happen. When Defendant was asked why he did not leave at that point, he said he did not know. Defendant indicated that he felt threatened and was scared but not scared enough to leave.

In Defendant's interview with detectives, he said that within thirty seconds to two minutes of the victim entering the bathroom, the fight escalated to the point of the victim getting shot. Defendant told Detective Cooley he and the victim were fighting over a firearm, and he was in a fight for his life. In his interview with detectives, Defendant said that in those two minutes, "it's a combination of talking, moving the gun around each other, just like I'm trying to grab her, I'm trying to hold onto her, it's just like, it was just, it felt like it was like a fight for survival." Defendant said that at some point, he and the victim "went to the ground for a little bit," and that "[he didn't] even know when the gun went off or how it went off, it just did." Detective Cooley asked Defendant if he was behind the victim when they were on the ground, and he replied, "[B]ehind, like kind of in like this like kind of trying to do like a choke hold shit thing or something. She was like trying to get the gun to me, so it was just in our general facial areas." Defendant was asked whether he stripped the gun from the victim at any point, and he said, "[N]ot until it was over. Not until she was on the ground." Detective Cooley testified that at the time,

8

Defendant was 6'2" and weighed 230 pounds, while the victim was 5'3" or 5'4" and weighed 130 pounds.

In his interview, Defendant said he felt the incident "was a f _ _king accident," noting that he did not try to murder anyone. He described his thoughts as "tonight, was more, for me, just being like get the f _ _k away from me kind of thing, like why the f _ _k is this the second time you're pulling a f _ _king gun on me." Defendant added that he was afraid for his life on that night. He felt the victim was going to shoot him, and he was just trying to grab and control the gun. Defendant told detectives that he had medical experience while in the Navy and then worked as an emergency room technician. They asked whether he felt the need to render medical aid to the victim, and he said he could not think and did not know how to react, never having been in that situation before.

During Defendant's interview, Detective Thompson asked him what happened after the shot was fired. Defendant said that he could not believe what happened, and the first thing he thought of was the victim's kids. He added, "I have to call somebody, I have to get someone here, I have to stand up for what I've done, like I feel this is partially, this is my fault, just the whole thing, the whole altercation." Defendant then unloaded the gun and closed and locked the bedroom door so the victim's kids would not go in. He said he then drove to the parking lot down the street and called 911. Before calling 911, Defendant called his ex-wife and told her he was sorry for everything and that he felt this was a fight and an accident. He said, "I don't feel like I killed them. I don't feel like I murdered anyone. I feel like I slipped." Defendant said he also tried calling his father, but did not get him.

As for Defendant's experience with guns, he told detectives, "I don't have a gun, I've never had a gun, I don't want guns, I hate guns, I think they're f _ _king terrifying, I don't want to f _ _k around with a gun, but she has one, so."

Pictures taken of Defendant at the station that night showed marks on his legs that he had gotten from the concrete when he was detained in the Burks Outlet parking lot. No other marks or cuts could be seen on his face, hands, arms, or torso. However, after Defendant's interview was played for the jury, Detective Cooley testified that, as seen on the video, Defendant scratched himself during the course of the interview.

Defendant's truck was searched by Detective Cooley after he obtained a search warrant. In his interview, Defendant told Detective Cooley that he was leaving town and that his belongings were packed. The search of Defendant's truck, which was filled with Defendant's personal belongings, corroborated this statement.

Detective Cooley testified that 911 was called at roughly "6 to 6:30," and footage from the next-door neighbor's camera showed Defendant's vehicle left the home at 6:18 p.m. Before calling 911, Defendant called his ex-wife and his father.

On cross-examination, Detective Cooley testified that the victim's hands were not bagged to allow for the detection of gunshot residue because Defendant admitted to 911 that he was the one holding the gun when the shot was fired.[2] In Defendant's interview, he said that when he gained control of the weapon, the shot was already fired. When Detective Cooley was asked if he thought the shooting happened the

---

[2] Dr. Terry Welke testified that gunshot residue testing is no longer used because it is unreliable.

way the prosecutor had earlier demonstrated it in the courtroom, this exchange occurred:

> A    No, sir. He was doing it by himself. What happened in that bathroom Mr. Derochowski never stated exactly what happened at the time that gun went off. So, I was unable to find out.
>
> Q    And he told you this that this woman was in front of him; right?
>
> A    Yes.
>
> Q    When the shot went off. Also told you that he was trying to get her in a wrestling move basically from the back side.
>
> A    Yes.
>
> Q    And so if her hands are loose, you don't think she could be swinging it back trying to get to him somehow?
>
> A    With the weapon?
>
> Q    Yeah.
>
> A    Yes.

According to Detective Cooley, he saw stippling on the victim at the scene, but he did not take a close-up picture of it. As for the marks on Defendant, Detective Cooley testified he observed a mark on Defendant's left elbow that was sustained when he was getting off the ground in the parking lot where he was detained. Although Detective Cooley was not at the parking lot, Officer Smith told him that is where the marks on Defendant's knees and elbows came from. When asked, Defendant said he did not need medical attention, and he never indicated that he had injuries as a result of the fight. According to Detective Cooley, Defendant was cooperative during the investigation.

During Defendant's interview, Detective Travis Thompson made the statement, "So, I don't think from what you're telling me, I don't think you - - that this intentionally escalated to a point where you shot her." Detective Cooley did not

11

recall whether he was in the room when this was said, but he acknowledged on re-direct examination that this could have been said as part of a "good cop, bad cop" strategy to gain Defendant's confidence. The following excerpts from Defendant's interview were highlighted during re-direct examination: "This is my fault," "Just the whole thing," "The whole altercation," "I feel guilty," and "I feel wrong." Additionally, it was noted that no substances were detected from the toxicology test performed on the victim.

Amber Downs of the Louisiana State Police Crime Lab was accepted by the court as an expert in the field of firearm examination. She analyzed the Smith & Wesson pistol provided to her in conjunction with this case, and her report was introduced at trial. She compared test-fired cartridges to the cartridge found on the scene and all the characteristics agreed, meaning the cartridge case was fired out of the weapon found at the scene. She testified about approximately five different safety features of the pistol. According to Ms. Downs, as long as the weapon was functioning properly, it would not fire when kicked across the room or dropped off a roof. For it to fire, it had to be "racked" back to chamber a round, and the firing trigger had to be depressed correctly. Ms. Downs explained that an accidental discharge can occur when the trigger is pulled, but she affirmed that accidental discharges are not caused by the gun getting "slapped or pushed or kicked."

Dr. Christopher Tape was accepted by the court as an expert in forensic pathology. He testified that he performed an autopsy on the victim's body. He determined the cause of death to be a gunshot wound to the head and the manner of death to be homicide. He testified that the bullet entered above the victim's right ear "very consistent with a contact [shot]." It exited the left side of the victim's head, traveling right to left, slightly upward, and slightly front to back. Dr. Tape felt that

this was a contact shooting, explaining that with this type of shooting, smoke and gunpowder go between the skin and the skull, creating a shellac laceration, which is a large star shape. Additionally, soot deposition was found in the victim's wound, which is consistent with a contact wound. Finally, there was a mark consistent with a muzzle imprint on the victim. Dr. Tape explained that this was similar to a contact wound he sees in suicides, "but there's no gun found at the scene in this case so it's a homicide by default." He explained that the star pattern seen on the victim's head is found when a weapon is pressed against the skin.

On cross-examination, Dr. Tape explained that if there is a finger on the trigger when someone is shot, it is either a suicide or a homicide. Determining who pulled the trigger is not his job. When it is an accident, he explained, "I have to have an even better story, a gun that misfires being dropped."

Defense counsel then posed hypothetical questions specifically related to this case:

> Q    If you would assume, just hypothetically that a person armed with a loaded pistol advances on another person with that pistol aimed at the other person. Assume further that the other person grabs at the gun and the attacker's hand in an effort to disarm his attacker and both fall to the ground in a struggle over the gun. Is it possible that at some point during the struggle the gun could have been in a position to have caused the injury you observed in this case? Assuming someone pulled the trigger.
>
> A    Almost nothing is impossible unless it's physically impossible. In that case that you described it might not be physically impossible because who knows how people are fighting or what positions they are in and so on. I think that's highly unlikely, but it's physically impossible, but a lot of things are possible.
>
> Q    Okay. So, without knowing, and that was my follow up and you apparently anticipated it or - - but without knowing the position of both people, assuming that they did fall to ground [sic] and are struggling over the gun. Without knowing their positions at the time of the discharge, it's impossible to say whether that could or could not have happened. Is that a fair statement[?]

A     You said, is it possible? I mean hypothetically in a struggle for the gun you might have a situation where the gun could go off.

Q     Absolutely.

A     And the finger could be there on trigger and the - - you could have different kind of gunshot wounds, including what's in this case. I think it's highly unlikely, but it wouldn't be physically impossible. Now to anticipate your next question. It would still be a homicide in that case. I've had this sort of alleged incident before where it's sort of a struggle for the gun and it goes off, and I called it a homicide. And again, I call homicide, and this is pretty typical, it's a - - I have to be just fifty-one percent, you know. It's just more likely than not and it's basically a screening test. If you're familiar with a screening test versus a confirmation test. So, if you think you have a serious disease you will get a screening test first. And that screening test will catch everything that looks like that disease, but it's so sensitive that you might get things that are called, false positives. So, it's not really the disease but it looks like a false positive. So, then what you do is you have a confirmation test. That's highly specific, that will weed out all those false positives so then, you're sure. So, in a sense my manner of death of homicide is a screening test.

Q     Right.

A     You all are the confirmation test.

Q     It would be a homicide whether the gun was accidentally or intentionally discharged. It would still be a homicide it resulted in the death of a human being.

A     If the finger is on the trigger the gun is a lethal weapon. We've been designing it as humans for literally hundreds of years, including the ammunition, it's designed to kill for military, for law enforcement and so on.

Q     Right.

A     For hunting. So, if you pull the trigger you intend to kill something unless your [sic] target shooting and then your [sic] practicing killing.

Q     Right. But it is possible to reiterate, that the gun could be discharged in a struggle if someone pulled the trigger?

A     Absolutely. And again, I'll say nothing is impossible and in my line of work I deal with very rare circumstances because it's kind of the nature of it. If the Coroner can figure it out and sign the death certificate or better yet the doctor in the hospital, they sign the death certificate.

14

Q     Right.

A     But if it comes to me, it's already - - it's either homicide and they need to collect evidence or it's a mystery they need to solve. So, I deal with very rare events, and I've been fooled before and very rare events happen.

On re-direct examination, the hypothetical was further explored:

Q     Dr. Tape, I just want to very quickly kind of quantify something you've said. You said that based on the hypothetical you were given, it's very unlikely that a gun would go off in that manner; is that correct?

A     I mean, you can have a struggle, and the gun goes off, but to have it - - and I think if the hypothetical included having a gunshot wound similar to the one on Ashley Fish; is that correct?

Q     Correct.

A     So you'd have to have the gun in the contact position regardless of who pulls the trigger and how it got there.

Q     Right.

A     Again, it wouldn't be impossible but you would have to imagine - - and people don't just fight face to face, they are upside down, sideways and back to front. You know, people fight, they are struggling, it's a struggle. So, you know again, rare things happen. Almost nothing is impossible unless it's physically impossible. This is not physically impossible to sort of recreate the situation like this.

Q     Right. But my point is this; is it reasonable?

A     Well, I don't know if I can answer that. It's unlikely. Reasonable is something else, I think.

Q     That's fine, but it is unlikely.

A     I think so.

Q     Would it be more likely during a struggle if I give you the same hypothetical, in that struggle the weapon would not be a contact wound injury[?]

A     That's fair to say.

Q     It would not be a contact wound.

15

A     Exactly. If you're in a struggle, it would be unlikely, but again, not impossible. It would be more likely if it'd be a contact that you might expect it on the body where you're struggling back and forth with the body, when you get shot in the body and not the head necessarily. Because again, it's the side too, it's not the front of the head where you're struggling against the gun. So, I'm not sure how or why you'd be in the struggle, but people fight in different ways.

Q     Sure. Understand.

A     It's a struggle.

Dr. Terry Welke was accepted by the court as an expert medical physician with a specialization in forensic pathology.  In anticipation of calling Dr. Welke as an expert witness, the State provided him with the 911 call transcript, a copy of Defendant's statement to Detectives Cooley and Thompson, crime scene photographs, autopsy photographs, and the autopsy report.  Dr. Welke, like Dr. Tape, believed this to be a contact gunshot wound, not an accident, and either a suicide or homicide.[3]

Josh Fish, the victim's ex-husband, testified that he and the victim married in 2012 and had four daughters.  The couple later moved to west Texas, pursuing a job opportunity for Mr. Fish.  In January 2021, Mr. Fish found out that his wife had met Defendant.  Though they tried counseling and working on the marriage, a couple of months later, the victim moved back to DeRidder.  Within a couple of weeks, the victim indicated she wanted to file for "separation for divorce," so they did.  Mr. Fish then successfully secured a transfer to Beaumont, Texas, to be closer to his children.  According to Mr. Fish, he and the victim were successful at co-parenting,

---

[3] On cross-examination, Dr. Welke testified that he had not worked with Dr. Tape and did not know him beyond crossing paths with him at a grand jury proceeding a couple of years prior.

16

and he never had a problem with her becoming aggressive, violent, nor threatening in any way.

On April 7, 2022, at 4:32 p.m., Mr. Fish received a phone call from Defendant. He simultaneously received a text from the victim telling him not to answer Defendant's call. At 4:32 p.m., Mr. Fish responded to the victim, "I'm not trying to get in ya'lls [sic] drama." The victim responded, "[H]e won't leave." When Mr. Fish did not answer the 4:32 p.m. call, Defendant left a voice message telling Mr. Fish that he had been staying overnight at the victim's house. At 5:50 p.m., the victim texted Mr. Fish, "I'll have the girls call soon. Trying to do dinner and stuff. I guess call when you're ready later. I'm still working on my situation here." That was the last text he received from the victim.[4] On cross-examination, Mr. Fish testified that the victim owned a Smith & Wesson gun which they had purchased together in 2016.

Sheila Krebsbach, the victim's mother, testified that she found out about her daughter's relationship with Defendant shortly before her daughter moved back to DeRidder. Mrs. Krebsbach saw Defendant when she visited her daughter's house, but they did not interact much. Mrs. Krebsbach testified that she never knew her daughter to be aggressive or physically violent.

Zigmond Derochowski, Defendant's father, testified that he and his wife adopted Defendant when he was about four years old. According to Mr. Derochowski, when Defendant got in trouble as a child, he told on himself. As he got older, he was never arrested, and his parents did not receive any complaints from

---

[4] We note the content of the 5:50 p.m. text from the victim to Mr. Fish was not mentioned in Mr. Fish's testimony, but the photograph of the text message was introduced in evidence as S-26 and published to the jury.

school officials about bad behavior. He attended college and dropped out in his second year to join the Navy. He was honorably discharged approximately ten months later, and he then married in 2016. The couple divorced in August 2021. Defendant's former spouse attended the trial with his parents because she "totally believe[d] in [Defendant's] innocence, because that's not the type of guy he is." According to Mr. Derochowski, she also flew to Louisiana from Oregon to attend three other hearings in Defendant's case.

Theresa Derochowski, Defendant's mother, testified that she and her husband adopted four boys: Defendant, Defendant's twin brother, and Defendant's twin half-brothers. The four boys shared the same biological mother. Mrs. Derochowski testified Defendant did well in grade school but had "a little bit of a rough patch, freshman year maybe didn't want to do his schoolwork." But by his senior year, he earned the optimist award for the greatest turnaround in academic work. Mrs. Derochowski described her son as funny, articulate, kind, and gentle, preferring to put spiders outside rather than killing them. Because they believed in Defendant's innocence, his parents refinanced their home to pay for his legal representation.

On cross-examination, Mrs. Derochowski testified that she was shocked her son became involved with a married woman, something of which she did not approve. Likewise, she was shocked that he was arrested for murder, neither infidelity nor murder being in line with his character.

Defendant's argument on appeal is that he did not shoot the victim nor intend to shoot her, the position he maintained in his statement to detectives. He contends that despite the fact the shooting occurred as he and the victim were struggling for the gun, he felt guilty and responsible, not because he pulled the trigger, but because he handled the situation poorly. Specifically, "[Defendant] stated several times that

18

had he just left two days earlier, had he not called the [victim's] ex-husband and left a voicemail, or had he just stood there and let [the victim] do whatever she intended to do with the gun, Ashley Fish would still be alive." Additionally, he alleges he did not flee the scene; rather, he drove to a public area, called 911, and waited for an officer to pick him up, a reasonable reaction after being involved in a traumatic event.

Defendant argues that it was reasonable to believe that the victim grabbed the gun, cocked it, and grabbed her phone to record what happened when she encountered Defendant. He additionally contends it is reasonable that the items on the vanity remained undisturbed because he and the victim fell to the floor when the fight began, noting that items on the towel rack *were* disturbed. Further, he notes that Dr. Tape acknowledged that people can be in all kinds of positions during a fight, and a muzzle imprint could occur during a struggle. Also, he notes that Dr. Welke's definition of homicide is when one person causes the death of another with no mention of intent.

Defendant maintains that the struggle over the gun caused the victim's death, whether she pulled the trigger, Defendant pulled the trigger, or the gun accidentally discharged. In light of these things, Defendant argues his hypothesis of innocence was reasonable and not refuted. He concludes his argument by noting he made no attempts to hide the victim's body, dispose of the gun, or disturb the scene. Additionally, he points out that he locked the bathroom door to prevent the children from seeing their mother, and he called law enforcement within minutes of the shooting. He was cooperative and argues that his actions are not consistent with someone who intentionally shoots another.

Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." In *State v. Richardson*, 16-107, pp. 4–6 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 346–47 (alterations in original), this court discussed the standard for reviewing the sufficiency of the evidence in cases based on circumstantial evidence:

> The standard of appellate review for sufficiency of the evidence claims is well-settled. In *State v. Macon*, 06-481, pp. 7–8 (La. 6/1/07), 957 So.2d 1280, 1285–86, the supreme court reiterated that standard, stating:
>
>> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*
>
>> . . . .
>
> Here, the parties dispute whether the State's case involved purely circumstantial evidence, or whether it relied upon a combination of direct and circumstantial evidence, or whether it relied upon a combination of direct and circumstantial evidence to prove the defendant's involvement. "Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue[.]" *State v. Lilly*, 468 So.2d 1154, 1158 (La.1985). Circumstantial evidence, however, "consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *Id.*

In *State v. Major*, 03-03522, p. 6 (La. 12/1/04), 888 So.2d 798, 801–02, the supreme court explained that:

> when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule that "assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every reasonable hypothesis of innocence." However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence. *State v. Toups*, 01-1875, p. 3 (La.10/15/02), 833 So.2d 910, 912; State v. Chism, 436 So.2d 464, 470 (La.1983). When evaluating circumstantial evidence, the trier of fact must consider
>
> > the circumstantial evidence in light of the direct evidence, and vice versa, [and] the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.
>
> *Chism*, 436 So.2d at 469.

In his 911 call, Defendant admitted that he shot the victim and that he committed a crime. At trial, he maintained that this was an accidental shooting that occurred when the victim pulled a gun on him. The evidence presented at trial established that the victim was right-handed, and her cell phone was found in her right hand, suggesting the gun would have been in her left hand. The evidence showed she was killed by a contact gunshot wound on the right side of her head. This court notes the jury could have found that it is not likely that a struggle over the

gun in the victim's left hand could have inflicted a wound on the right side of her head. Additionally, expert testimony presented at trial indicated that contact wounds are not accidental. Further, although Defendant said he was in a fight for his life with the victim, there was little to no disturbance of the items in the bathroom where the struggle occurred, and no injuries sustained by Defendant. Additionally, in the late afternoon/early evening of the shooting, the victim sent a text message to her ex-husband indicating that she and Defendant were arguing, and he would not leave. After the shooting, Defendant did not attempt to render medical aid despite having medical training. Having reviewed the record in the light most favorable to the prosecution, there is sufficient evidence to support the jury finding beyond a reasonable doubt that Defendant shot the victim with the specific intent to kill or inflict great bodily harm.

Defendant contends that if this court concludes that the shooting was not an accident and he shot the victim, this court must consider whether there was sufficient provocation to conclude the killing was done in sudden passion or heat of blood. He notes that the call to Mr. Fish and the text messages between Mr. Fish and the victim support his assertion that the two were arguing. Additionally, he notes the State offered no evidence to dispute that the victim had pulled a gun on Defendant two days prior, and once again just prior to the shooting. He contends his second degree murder conviction should be reversed and the responsive verdict of manslaughter entered.

As discussed above, this court finds there was sufficient evidence presented by the State to prove beyond a reasonable doubt that Defendant acted with the specific intent to kill the victim, rendering this argument moot.

22

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant claims the trial court erred in failing to grant his motion for new trial based on the State's introduction of his entire interview with detectives without redacting references to a polygraph examination. He further asserts counsel was ineffective in failing to object and seek a redaction of these references before the recording was published to the jury.

The defense filed a motion for new trial acknowledging its deficiency in failing to request redaction of references to a polygraph examination from Defendant's interview with detectives resulting in a prejudicial error and defect in the proceeding as contemplated by La.Code Crim.P. art. 851(B)(4). This provision states that the court, on motion of the defendant, shall grant a new trial when "[t]he defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment."

At the hearing on Defendant's motion, the State called Detective Thompson as a witness. He explained that asking a suspect about taking a polygraph examination is an investigative tool:

> Usually whenever I ask about a polygraph it's to - - I use it as an investigative tool. It allows me to usually have further talks with someone. It usually will initiate obviously some form of response, whether if I ask if they'd like to take obviously a yes or a no. Which usually helps me continue a conversation.

A polygraph examination was not administered to Defendant. It was discussed for approximately one minute during Defendant's two-and-one-half hour interview. Detective Thompson was asked whether he spoke with anyone from the District Attorney's Office prior to trial about the reference to a polygraph in Defendant's interview, and he said they had not.

23

The prosecutor addressed the ineffective assistance of counsel allegation and pointed out that over sixty motions were filed, and the case was zealously defended. He suggested that the possibility of reference to a polygraph examination escaping defense counsel's attention was not believable. He further noted that there was a motion to admit the statement taken up at a pretrial hearing, yet there was no objection on this basis by the defense. In response, defense counsel said they missed the polygraph reference, and they were ineffective as a result.

The judge denied the motion for new trial, stating the following regarding the polygraph reference:

> The mention of the polygraph, first of all, I will say that there are cases that say that this is not reversible error. And while both counsels [sic] have some obligation, the bottom line is that I have to consider the fact that this was given in discovery to defense counsel.
>
> On December 7, 2023, a motion was heard by this Court to determine the admissibility of this very statement. I found it admissible. There was no objection to the Court's ruling. At the jury trial, there was no contemporaneous objection to the statement after hearing of the polygraph. There was no request made by any counsel, specifically defense counsel, to instruct the jury at that point in the trial as to the legalities of the polygraph or in jury instructions.
>
> It was not new evidence, it was made available in discovery and certainly at least before the pre-trial motion on December 7th, 2023, and does not meet the requirements of Louisiana Code of Criminal Procedure Article 851[(b)(4)], as it is considered that knowing the existence of this, yet making no objection defense counsel did not find the mention to be objectionable and an issue to be addressed. And [they] cannot now take the opposite trial strategy in hindsight in an effort to seek to effectuate a new trial. So, to that extent, this claim is also denied.

We find the trial court was correct in its finding that this issue does not fall within subsection (B)(4) because defense counsel was provided Defendant's interview in discovery. However, even assuming counsel was ineffective in failing to request redaction or object to the admission of the entire statement, including the

24

statements regarding a polygraph examination, any error in the reference to the

polygraph examination was harmless error.

Near the close of the two-and-one-half hour interview, Defendant was asked:

| | |
|---|---|
| Thompson: | Can I offer you something? So, you talked about wanting an advocate, somebody on your side, something that we can offer you is a polygraph, do you know what that is? Do you know what a lie detector is? |
| Derochowski: | Yes. |
| Thompson: | So, a lie detector test is what we call a polygraph test and we can actually have somebody here that can ask you very specific questions that you already know what those questions are, it won't be many, it's like three or four questions, five tops, usually, we can ask you very specific questions just about that event between you and Ashley and just afford you opportunity to give an answer and determine whether or not, obviously, you're being truthful. I mean, that, that's the whole, the whole reason we're all here. We just want to make sure we're finding the truth. We can afford you that opportunity. We can, we can show that. Now, we we [sic] like to offer that. We want to offer that, but it's up to you whether you chose [sic] to do it or not. |
| Derochowski: | I don't want, I, I don't know if I'm going to have to take one eventually anyways- |
| | . . . . |
| | In terms of like having representation right now, talking this out with somebody, that feels better to me then right now, where I'm at right now, with my adrenaline, where like my heart rate is at, yeah, I'm going to give a f _ _k up polygraph. My heart beat is going to like, it's through the roof right now, like I'm not going to stand a chance right now, so, I'm trying to like, I want to tell the truth, I want to feel like I'm kind of, like someone's kind of protecting me a little bit unless we get to like, this is like the, this is a lot about to change and a lot of people's lives, a lot has already f _ _king changed and so I'm trying to be like, I feel alone right now and, and I feel like I've told you guys like a lot of shit, I feel |

like a lot of people come in here and just say I want a lawyer right off the bat and they're done, they don't want to say a damn word. I've tried to be, give you guys as much as I can because I need to get that off my chest about what the f _ _k happened tonight –

Thompson:     Absolutely.

Derochowski:  But I'm at the place where I'm like, I feel like the more I keep talking, if I just say the wrong thing or I f _ _k up, I know I'm being recorded so if I say something or if I say the wrong thing, I just feel like, I feel like tonight is my fault, but I'm also looking at it as something I wanted, I was protecting myself, I kept my, I stayed alive, I felt threatened and I felt like my life was going to end just as her life could've ended, it was, it was a f _ _ked situation. I didn't murder somebody, I didn't kill anyone, I didn't, I was just fighting, I was surviving and like that's as far as I'll go with that. I do, I like, I've, you're nice, you guys are like, been really nice to me, I know it's like, you probably think I'm the worst piece of shit in the world, but I'm trying to tell the truth, being honest and being truthful and like I want to keep talking about it, but I also just feel like I want, I've never had a lawyer before. I don't know if it feels better having someone kind of like asking me questions and suggesting what I say or don't say, I don't know. I just feel like, right now, the whole world, if they know what just happened, they're probably like that guy's a piece of shit, so I'm like, feel really alone, where like I don't have anyone. My family's not here, no one is here. I understand, I understand that Ashley's not here either and I'm trying to process that shit right now –

Thompson:     I know you are.

Derochowski:  But –

Thompson:     Look –

Derochowski:  I'm trying to make, I'm trying to tell the truth and be honest because there's a lot of people that are going to be affected by this f _ _king, there's a lot of people that are going to be affected by this and so I want to have it right, I want to have it said correctly, I want to have it, details correctly.

26

The State contends that neither appellate nor supervisory jurisdiction may be invoked to review the denial of a motion for new trial except for error of law. Nevertheless, it goes on to address the merits of Defendant's claim and this court will as well.

In *State v. Evans*, 98-1850, pp. 9–11 (La.App. 3 Cir. 5/5/99), 734 So.2d 866, 871–73, *writ denied*, 99-1616 (La. 12/17/99), 751 So.2d 871, a case cited by Defendant in support of his position, this court addressed a similar issue:

> By assignment of error number one, the Defendant contends that the trial court erred when it denied his motion for mistrial after the District Attorney made reference to the polygraph examination taken by the State's key witness, Eric Pickens.
>
> During the prosecutor's opening statement, he said:
>
> Eric Pickens has entered into an agreement, that agreement with the State of Louisiana that he takes a polygraph, then pleads guilty to the offense of manslaughter, agrees to testify truthfully and after he testifies, take another polygraph.
>
> The prosecutor contends that the reason he told the jury about the polygraph test was to set forth the elements of the plea agreement Eric Pickens had made, and that he did not mention the results of the test or even that the test had been taken.
>
> Evidence of a polygraph examination or any reference thereto during trial is inadmissible in Louisiana. *State v. Catanese*, 368 So.2d 975 (La.1979); *State v. Hocum*, 456 So.2d 602 (La.1984). Polygraph evidence for any purpose is to be excluded from a criminal trial to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony. *State v. Tonubbee*, 420 So.2d 126 (La.1982); *State v. Davis*, 407 So.2d 702 (La.1981). Such a reference invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully. *Id.*; *see also*, *State v. Refuge*, 270 So.2d 842 (La.1972).
>
> In *State v. Hocum*, 456 So.2d 602 (La.1984), the court considered a similar issue. The *Hocum* court stated that:
>
> By informing the jury that the witness had testified under protection of a grant of immunity, that the grant of

27

immunity was conditioned upon his taking and passing a polygraph examination, and that the grant of immunity did not apply to perjury or any crime other than the Hocum abduction, the state, in effect, informed the jury that the witness had passed an examination with regard to the Hocum case and would testify at trial consistently with his examination or expose himself to a perjury prosecution. Thus, the state's conduct and the trial judge's ruling were clear violations of this court's decisions prohibiting the use of polygraph evidence in criminal trials.

The trial court fell into error because it assumed that the state had a duty to place the entire immunity agreement before the jury. It is true that suppression of material evidence constitutes a violation of due process justifying a new trial irrespective of the good faith or bad faith of the prosecution; *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and, that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Evidence is not admissible, however, simply because it is contained in an immunity or plea agreement which must be disclosed to the court and the defendant. References to irrelevant, prejudicial and otherwise inadmissible matters are often excised. See, e.g., *United States v. Roberts*, 618 F.2d 530 (9th Cir.1980); *United States v. Arroyo-Angulo*, 580 F.2d 1137 (2nd Cir.1978). Consequently, the state was obliged to disclose the terms of its immunity for testimony agreement with its witness, but that duty did not make evidence of a polygraph examination admissible or give the state the right to introduce it over defendant's timely objection.

We do not, however, automatically reverse a conviction whenever an impermissible reference is made to the occurrence of a polygraph examination during a criminal trial. A reversal and a new trial is required only if there is a reasonable possibility that the error complained of might have contributed to the conviction. *State v. Gibson*, 391 So.2d 421 (La.1980).

*Hocum*, 456 So.2d at 605.

In *Hocum*, the court found that the case against the defendant depended almost entirely on the witnesses' testimony and that without it there could have been no indictment and no evidence to carry the case to the jury. Therefore, the court found that the witnesses' credibility

28

was an important issue in the case, and there was more than a reasonable possibility that the jury's knowledge that the witness had successfully passed a polygraph test on the subject of his testimony could have affected its judgment and contributed to its verdict. *Id.*

In the present case, at the close of the opening statements the judge admonished the jury as follows:

> Ladies and gentlemen of the jury, before we proceed with the taking of evidence, I have been requested to admonish you on a principle of law. It is the judicial policy of this State to exclude polygraph evidence in criminal trial. You are not to consider any reference to the taking of a polygraph test in assessing the credibility of witnesses in this case.

Although the testimony of Pickens was very important to this case, there was testimony from Tinsley which supported the information to which Pickens testified. Further, after the reference during opening statements and the admonition by the judge, no further reference to the polygraph was made. The Defendant neither alleges nor offers any proof as to how he was prejudiced or how this error might have contributed to his conviction. Therefore, we find this argument is without merit.

In *State v. Nicholas*, 10-1808, p. 6 (La.App. 1 Cir. 5/6/11) (unpublished opinion) (2011 WL 2616854), *writ denied*, 11-1411 (La. 9/23/11), 69 So.3d 1167, the first circuit stated:

> It is well established that polygraph test results or any reference to a witness taking such a test are inadmissible for any purpose at the trial of guilt or innocence in a criminal case, whether intended as substantive evidence or as relating to the credibility of a witness. However, an impermissible reference to a polygraph test constitutes reversible error only if there is a reasonable possibility that the error complained of might have contributed to the conviction. See LSA-C.Cr.P. art. 921; *State v. Legrand*, 2002-1462, pp. 10–11 (La.12/3/03), 864 So.2d 89, 98, *cert. denied*, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005).

In *State v. Arnold*, 533 So.2d 1311 (La.App. 3 Cir.), *writ denied*, 534 So.2d 959 (La.1988), this court reviewed the trial court's ruling on the defendant's pre-trial "Motion to Permit Introduction Of Results Of Voice Stress Analysis Test." In doing so, this court stated:

The Louisiana courts have also made it clear that the *Catanese* rule excluding polygraph evidence for any purpose in criminal trials also operates to prevent any reference during trial to the fact that a witness has taken a polygraph test or PSE test with respect to the subject matter of his testimony. *State v. Hocum*, 456 So.2d 602 (La.1984), writ den., 472 So.2d 922 (La.1985); *State v. Thompson*, [381 So.2d 823 (La. 1980)]. The Louisiana Supreme Court has also held, based upon the premise that PSE tests are inadmissible, that any pre-test interviews are inadmissible where they refer to the fact that a polygraph test or a PSE test was conducted. See *State v. Hocum*, *supra*; *State v. Thompson*, *supra*. The *Thompson* court made it clear that the *Catanese* rule excluding polygraph evidence for any purpose also operates to prevent any reference at trial that a witness has taken a PSE examination. This precaution eliminates any problem with the jury making inferences that the witness passed the lie detector test and, therefore, is testifying truthfully. *State v. Davis*, 407 So.2d 702, 706 (La.1981); *State v. Refuge*, 270 So.2d 842, 846 (La.1972).

. . . .

Applying the principles of law set forth above, we find that the trial court was correct in denying relator's Motion To Permit Introduction Of Results Of Voice Stress Analysis Test and the circumstances surrounding the test at the time of trial.

The ruling of the trial court granting defendant's motion, and allowing defendant to play the two videotaped statements in their entirety to the jury at the time of trial, should be clarified. The two video-taped statements did contain certain references to the PSE test and to polygraph tests which should be excised from the video-tapes before they are shown to the jury at the time of trial. Therefore, this court amends the order of the trial court granting the defendant's motion to have his video-taped statements of December 10, 1987 and December 13, 1987 exhibited in their entirety to the jury at the time of trial by ordering that any references to lie detector tests, PSE tests, polygraph tests, or the results thereof in the defendant's two video-taped statements must be excised from the defendant's two video-taped statements before their receipt into evidence and presentation to the jury.

For these reasons, the writ previously granted in this matter is made peremptory in part and is recalled and denied in part. The matter is remanded to the trial court for further proceedings consistent with this opinion.

*Id.* at 1315–16.

In this case, the State notes that although polygraph examination results are inadmissible, no examination was conducted in this case. The State asserts that in cases such as this, where there is simply a reference to a polygraph examination, the reference is considered harmless error.

Even assuming the reference to taking a polygraph examination was improperly admitted in evidence as part of Defendant's recorded interview with detectives, any such error was harmless. In his 911 call, Defendant admitted he shot someone, and he committed a crime. The evidence presented at trial did not support a finding that the shooting was accidental. Under these facts, any error in the improper admission of an offer for Defendant to take a polygraph examination did not contribute to his conviction. Accordingly, we find this assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER THREE

Defendant contends the trial court abused its discretion in concluding that there was evidence to support the inclusion of a flight instruction in its charge to the jury. At trial, defense counsel argued that although Defendant left the scene, he did so because he did not feel comfortable staying there, not due to consciousness of guilt. The trial court ruled:

> Well, with all due respect it's not clear to everyone as it is to you that he was going to turn himself in. The facts show that the - - that Ms. Fish was dead, he left with a load - - a truck with all his personal items in it and left four young children at the scene, the oldest being nine years old. Which I would not expect a nine-year-old under those circumstances to have the wherewithal to care for children under those circumstances. There was no other neighbor contacted about it. He left. I do not know what his state of mind was and that is why this says, "if" in a number of different places because it is the choice of the jury to see how that applies. And those [sic] this statement says, if you find the defendant fled immediately after a crime was committed or after he was accused of a crime, the flight alone is not sufficient to prove that the defendant is guilty, however flight maybe [sic] considered along with

31

all over [sic] evidence you must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt[]. So, it would be up to each of you in your closing argument to argue which one of those they should decide, but they are given that opportunity to make that decision.

So, I will include the flight instruction.

The court instructed the jury as follows:

If you find that the defendant fled immediately after a crime was committed or after he was accused of a crime, the flight alone is not sufficient to prove that the defendant is guilty. However, flight may be considered along with all other evidence. You must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt.

On appeal, Defendant notes that he told detectives he left because he did not feel right being at the house. He admitted he felt guilty because he triggered the victim's aggression toward him, not because he shot her. Instead of driving out of town, Defendant drove to a public area and called 911. He contends that, by the jury being given this instruction, he was prejudiced because it allowed the State to argue that his actions immediately following the shooting showed consciousness of guilt, even though no evidence was offered to show he intended to avoid detection or apprehension.

The State argues the trial court's ruling was correct in that Defendant did in fact leave the scene almost immediately, and even if the instruction was improperly given, it was harmless given the totality of the evidence presented at trial. Further, the State points out that it was permitted to address Defendant's flight in its closing argument regardless of whether the flight instruction was given to the jury.

We find the jury charge did not affect what was allowed in closing argument. Louisiana Code of Criminal Procedure Article 774 provides that the closing argument is "confined to evidence admitted, to the lack of evidence, to conclusions

of fact that the state or defendant may draw therefrom, and to the law applicable to the case." Thus, this claim has no merit. As for Defendant's challenge to the inclusion of the State's requested flight instruction, this court finds his claim has no merit.

In *State v. Wells*, 11-744, pp. 13–14 (La.App. 4 Cir. 4/13/16), 191 So.3d 1127, 1140, *writ denied*, 16-918 (La. 4/24/17), 219 So.3d 1097, the fourth circuit addressed this issue:

> Mr. Wells alleges this instruction presupposed a crime was committed and undermined his presumption of innocence. An instruction on flight, however, is permitted in criminal cases where it is supported by the evidence. *See*, *e.g.*, *State v. White*, 329 So.2d 738, 741–42 (La.1976); *State v. Garner*, 45,474, p. 15 (La.App. 2 Cir. 8/18/10), 47 So.3d 584, 592; *State v. Smith*, 03-786, pp. 10–11 (La.App. 5 Cir. 12/30/03), 864 So.2d 811, 820–21. Here, there was sufficient testimony to support a flight instruction as Mr. Wells admitted leaving the scene immediately after shooting Big Herb. Moreover, the jurors were instructed to first decide whether such flight occurred, and second, whether that flight was probative of guilt or not. *See State v. McIntyre*, 381 So.2d 408, 412 (La.1980) ("The court did not force the jurors to choose between two inferences but merely stated that a jury must either consider that evidence introduced is probative of the defendant's guilt or that it is not."). We find no erosion of the presumption of innocence.

In *State v. Berry*, 95-1610, pp. 23–24 (La.App. 1 Cir. 11/8/96), 684 So.2d 439, 459, *writ denied*, 97-278 (La. 10/10/97), 703 So.2d 603, the first circuit stated:

> Berry's forty-seventh assignment of error urges that the trial court erred in refusing to delete its jury instruction concerning flight of the defendant after the crime. The defense contended at trial that the flight charge is reserved for situations in which a defendant fled from law enforcement authorities, a circumstance not present in this case as Berry turned himself in to police shortly after the shooting. The defense position on this issue is unsupported by the jurisprudence, which indicates that the jury may consider evidence of flight from the scene of a crime whether or not law enforcement personnel are involved. *See State v. Davies*, 350 So.2d 586, 588–89 (La.1977). As the trial court did not err in including this charge, this assignment lacks merit.

While Defendant did leave the scene of the shooting in his truck loaded with his personal belongings, the jury was instructed that *if* it found that Defendant fled

immediately after the crime, that fact alone was not sufficient to prove his guilt. Rather, it could be considered along with all other evidence. If the jury determined Defendant fled, it then was to decide whether such flight was due to consciousness of guilt or other reasons. In connection with the remainder of the jury charge, the instruction was not erroneous or prejudicial.

## CONCLUSION

Defendant's conviction and sentence is affirmed. This matter is remanded to the trial court to amend the Uniform Commitment Order. Specifically, the trial court is ordered to amend the minutes and commitment order to correctly reflect the sentence imposed, life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

**CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH INSTRUCTIONS.**